## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HUBBARD-HALL INC., | : | CIVIL ACTION NO. 3:13-cv-00104-RNC |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| MONSANTO COMPANY, | : | |
| PHARMACIA CORPORATION, | : | |
| PFIZER INC., | : | |
| SOLUTIA INC., and | : | |
| JOHN DOES 1-20, | : | |
| | : | |
| Defendants. | : | FEBRUARY 7, 2014 |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, FOR JUDGMENT ON THE PLEADINGS

Stephen E. Goldman (ct06224)
Jeffrey J. White (ct25781)
Sorell E. Negro (ct29195)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597
Telephone:  (860) 275-8237
Facsimile:   (860) 275-8299
sgoldman@rc.com
jwhite@rc.com
snegro@rc.com

Attorneys for Defendants Monsanto Company,
Pharmacia Corporation, Pfizer Inc., Solutia Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND .............................................................................................. 4

      A.    PROCEDURAL HISTORY .................................................................... 4

      B.    FACTUAL BACKGROUND .................................................................. 5

            1.    Background on PCBs ................................................................... 5

            2.    History of Plaintiff's Chemical Business and PCBs on Its Property ......... 5

                  a.    Overview of Plaintiff's Operations ................................. 5

                  b.    1982:  First Notification of PCBs on Plaintiff's Property............. 6

                  c.    Mid-to-Late 1980s:  Plaintiff Becomes Embroiled in
                        Superfund Site Contaminated with PCBs that Threatened
                        Its Business ................................................................... 7

                  d.    1992-1993:  Second Notification of PCBs on Plaintiff's
                        Property......................................................................... 9

                  e.    1997:  Third Notification of PCBs on Plaintiff's Property ......... 13

                  f.    2000:  Fourth Notification of PCBs on Plaintiff's Property
                        as Plaintiff Tells DEP that PCBs Are a "Site-Specific
                        Contaminant of Concern" ............................................... 14

                  g.    2001-2003:  Fifth Notification of PCBs on Plaintiff's
                        Property Through Multiple Communications with Its
                        Environmental Consultant (ALTA) ................................. 17

                  h.    2004:  Sixth Notification of PCB Contamination as DEP
                        Again Notes PCB Contamination on the Property ..................... 21

                  i.    2004:  Seventh Notification of PCB Contamination on
                        Plaintiff's Property as Plaintiff Notifies Its Insurance
                        Carrier of PCB Contamination.......................................... 22

                  j.    2006-2007:  Eighth Notification of PCB Contamination on
                        Plaintiff's Property When Another Environmental
                        Consultant Finds PCBs in Water and Soil Samples on the
                        Property......................................................................... 23

                  k.    2008:  Plaintiff Is Finally Forced To Address the PCBs on
                        Its Property After the Transformer Incident ..................... 24

            3.    2010:  Plaintiff Finally Files a Lawsuit and Maintains Throughout
                  that It Was Not Aware of PCBs on Its Property Until 2008..................... 24

**TABLE OF CONTENTS**
(continued)

**Page**

III.    ARGUMENT ........................................................................................................ 26

    A.    LEGAL STANDARD ..................................................................................... 26

    B.    DEFENDANTS' CPLA CLAIM SHOULD BE DISMISSED EITHER
          THROUGH SUMMARY JUDGMENT OR THROUGH A JUDGMENT
          ON THE PLEADINGS .................................................................................. 27

        1.    Plaintiff's CPLA Claim Is Barred by the Statute of Limitations ............ 27

            a.    Plaintiff's CPLA Claim Is Time-Barred Because Plaintiff
                  Discovered PCB Contamination on Its Property Years
                  Before 2008 ................................................................................. 29

            b.    Alternatively, Plaintiff Reasonably Should Have
                  Discovered PCB Contamination on Its Property Prior to
                  June 2008 .................................................................................... 37

            c.    Summary Judgment Should Also Be Granted Because
                  Plaintiff Took Some Investigatory Measures Previously ........... 44

        2.    Plaintiff's CPLA Claim Is Barred by the Statute of Repose .................... 46

    C.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
          PLAINTIFF'S CUTPA CLAIM .................................................................... 47

        1.    Plaintiff's CUTPA Claim Is Precluded Because Its Exclusive
              Remedy for Its Product-Related Property Damage Claims Is Under
              the CPLA ................................................................................................... 47

        2.    Plaintiff's CUTPA Claim Is Barred by the Statute of Limitations .......... 48

    D.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
          PLAINTIFF'S REQUEST FOR DECLARATORY RELIEF ............................ 47

IV.    CONCLUSION .................................................................................................... 49

## TABLE OF AUTHORITIES

**Page**

<u>Cases</u>

Amland Properties Corp. v. ALCOA,
    808 F. Supp. 1187 (D.N.J. 1992) ........................................................................... 30, 35

Amron v. Morgan Stanley Inv. Advisors Inc.,
    464 F.3d 338 (2d Cir. 2006) ........................................................................................ 27

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ...................................................................................................... 27

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) ...................................................................................................... 27

BellSouth Telecomms. v. W.R. Grace & Co.,
    77 F.3d 603 (2d Cir. 1996) .......................................................................... 28, 37, 43, 44

Bennett v. New Jersey,
    470 U.S. 632 (1985) ...................................................................................................... 46

Blackburn v. Miller-Stephenson Chem. Co.,
    1998 Conn. Super. LEXIS 2621 (Conn. Super. Ct. Sept. 11, 1998) .................................. 42, 43

Bogdan v. Zimmer, Inc.,
    165 Fed. Appx. 883 (2d Cir. 2006) ......................................................................... 29, 37

Bourbeau v. Alph Q, Inc.,
    2008 Conn. Super. LEXIS 1299 (Conn. Super. Ct. May 20, 2008) .................................. 29, 30

Cadlerock Props. Joint Venture v. Schilberg,
    2001 Conn. Super. LEXIS 1973 (Conn. Super. Ct. July 17, 2001) .................................. 30, 43

Calabrese v. McHugh,
    170 F. Supp. 2d 243 (D. Conn. 2001) ................................................... 29, 35, 44, 45

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ...................................................................................................... 26

Champagne v. Raybestos-Manhattan, Inc.,
    212 Conn. 509 (1989) ................................................................................................... 28

Credit Suisse Sec. (USA) LLC v. Simmonds,
    132 S. Ct. 1414 (2012) ................................................................................................. 45

## TABLE OF AUTHORITIES

**Page**

Crown v. Parker,
  462 U.S. 345 (1983)....................................................................................... 29

Dennis v. ICL, Inc.,
  957 F. Supp. 376 (D. Conn. 1997)............................................................. 32, 33

Durham Mfg. Co. v. Merriam Mfg. Co.,
  294 F. Supp. 2d 251 (D. Conn. 2003)............................................................ 28

Electric Power Bd. of Chattanooga v. Monsanto Co.,
  1987 U.S. District LEXIS 13365 (E.D. Tenn. Apr. 30, 1987).................................. 31

Estate of Maglione v. Gulf Oil Corp.,
  2007 N.J. Super. Unpub. LEXIS 1059 (N.J. Super. Ct. App. Div. Feb. 27, 2007) ........... 35, 36

F.P. Woll & Co. v. Fifth & Mitchell Street Corp.,
  1999 U.S. Dist. LEXIS 894 (E.D. Pa. Feb. 4, 1999) ............................................ 28

Fichera v. Mine Hill Corp.,
  207 Conn. 204 (1988) ................................................................................... 48

First United Methodist Church of Hyattsville v. U.S. Gypsum Co.,
  882 F.2d 862 (4th Cir. 1989) ......................................................................... 46

Florida Power & Light Co. v. Allis Chalmers Corp.,
  85 F.3d 1514 (11th Cir. 1996) ....................................................................... 45

Graziano v. Pataki,
  689 F.3d 110 (2d Cir. 2012)........................................................................... 27

Greene v. United States,
  376 U.S. 149 (1964)..................................................................................... 46

In re: Lejeune v. United States,
  2011 U.S. Dist. LEXIS 155687 (N.D. Ga. 2011) ................................................ 47

Johnson v. Rowley,
  569 F.3d 40 (2d Cir. 2009)............................................................................. 27

Meiri v. Dacon,
  759 F.2d 989 (2d Cir. 1985)........................................................................... 26

Mountaindale Condominium Ass'n, Inc. v. Zappone,
  59 Conn. App. 311 (2000) ............................................................................. 40

-iv-

## TABLE OF AUTHORITIES

**Page**

Nakahata v. New York-Presbyterian Healthcare Sys.,
    723 F.3d 192 (2d Cir. 2013)..................................................................................... 27

New West Urban Renewal Co. v. Viacom, Inc.,
    230 F. Supp. 2d 568 (D.N.J. 2002) ..................................................... 37, 38, 41, 42

OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.,
    503 F. Supp. 2d 490 (D. Conn. 2007)........................................................... 40, 42

Quadion Corp. v. Mache,
    1991 U.S. Dist. LEXIS 8222 (N.D. Ill. June 11, 1991) .......................... 36

Syms v. Olin Corp.,
    408 F.3d 95 (2d Cir. 2005).......................................................................... 35

Vector-Springfield Props., Ltd. v. Cent. Ill. Light Co.,
    108 F.3d 806 (7th Cir. 1997) ...................................................... 37, 38, 39

Zapata v. Burns,
    207 Conn. 496 (1988) ................................................................... 29

## **Statutes**

15 U.S.C. § 2605................................................................................................. 5

42 U.S.C. § 9658 .................................................................... 4, 27, 28, 47, 49

Connecticut General Statutes § 22a-133................................................. 15, 33

Connecticut General Statutes § 42-110g................................................... 4, 48

Connecticut General Statutes § 52-572n.................................................... 4

Connecticut General Statutes § 52-577.............................................. passim

## **Rules**

Fed. R. Civ. P. 12 ................................................................... 3, 26, 27, 46

Fed. R. Civ. P. 56 ................................................................... 3, 26

## I.      INTRODUCTION

Plaintiff Hubbard-Hall, Inc. is "the nation's most experienced chemical distributor," and "[a] virtual chemical supermarket," which has operated a chemical distribution, mixing, handling, and storage business in Waterbury, Connecticut, for decades.[1]  Plaintiff claims that its 16-acre property located at 563 South Leonard Street in Waterbury ("Property") has been damaged by the presence of polychlorinated biphenyls ("PCBs").

Plaintiff alleges that it (or its agents) purchased PCB-containing paint around 1954 (long before the manufacture of PCBs was banned) and used it to paint the "Tank Farm Building" and other structures on the Property.[2]  Am. Compl. (Doc. 38) at ¶¶132, 135; Pl.'s Object. & Res. to Defs.' First Set of Discovery at 3 (sworn by Charles Kellogg, Plaintiff's Chairman) (attached as Exhibit E).  Plaintiff, its predecessor, or its agent specifically used paint that contained PCBs on its buildings and other structures "because of the unique features of PCBs that made them especially valuable for use at a company in the business of the formulation, storage and distribution of chemical products."  Am. Compl. at ¶136.

Documents produced in this case, and testimony provided by Plaintiff and its executives, have revealed that Plaintiff was repeatedly informed between 1982 and 2007 of PCBs on its Property, including by environmental consultants and regulatory authorities in 1982, 1993, 1997, 2003, 2004, 2006, and 2007.   In 2000, Plaintiff also told the Connecticut Department of

---

[1]      Hubbard-Hall's Website,  http://www.hubbardhall.com  (last visited Feb. 2, 2014) (attached as Exhibit A).

[2]      Even though Plaintiff alleges in its Amended Complaint that it "purchased and used" the PCB-containing paint because of the "valuable" properties of PCBs in paint, Am Compl. at ¶¶135-36, its corporate representatives have stated that they were not aware of PCBs on the Property prior to 2008.  Kellogg 9/30/13 Dep. Tr. at 114 (copies of all deposition transcript excerpts of Charles Kellogg cited herein are attached as Exhibit B); Hart 10/2/13 Dep. Tr. at 17 (copies of all deposition transcript excerpts of Margaret Hart cited herein are attached as Exhibit C); Skipp 10/25/13 Dep. Tr. at 90-91 (copies of all deposition transcript excerpts of Andrew Skipp cited herein are attached as Exhibit D).

Environmental Protection ("DEP" or "DEEP") in multiple pieces of correspondence that PCBs had been found on its Property, and that it would conduct further investigations for the contaminant and would remediate the contamination accordingly.  However, Plaintiff did not investigate and/or remediate further as recommended by its own consultant in 2003.

On June 9, 2008, a transformer from a utility pole abutting the Property fell down during a storm onto the roof of Plaintiff's Tank Farm Building.  *Id.* at ¶88.  Plaintiff alleges that during subsequent investigations by the power company and regulatory authorities, PCBs were found in the exterior and interior walls of the Tank Farm Building as well as in the surrounding soil.  *See id.* at ¶¶93-96.  DEEP and The U.S. Environmental Protection Agency ("EPA") subsequently required Plaintiff to remediate the PCB contamination.  *Id.* at ¶¶104-09.

In 2010, Plaintiff sued defendant Monsanto Company based upon the allegation that Monsanto Chemical Company and its successor, Monsanto Company (collectively referred to as "Old Monsanto"), were the sole manufacturers of PCBs in the United States before PCBs were banned in 1977.  *Id.* at ¶¶13, 15, 20.  Plaintiff claims that Old Monsanto had manufactured the PCBs that were in the paint used on Plaintiff's Property and that various John Does designed, manufactured, distributed, marketed, and/or sold the paint to Plaintiff at some unspecified time.[3] *Id.* at ¶¶54-55, 100, 132, 135.  Plaintiff alleges that the PCBs migrated from the paint and into the concrete structure of its Tank Farm Building and were deposited in the soil.  *Id.* at ¶¶101-02, 140.  Plaintiff seeks, among other things, to recover the costs of remediation due to the PCB contamination and damages for "the diminution in the value of Hubbard-Hall's property associated with the deed notation required by the proposed PCB mitigation plans."  *Id.* at ¶¶2-3, 131, 133, 138 (p. 25), 161; *see id.* at p. 27.

---

[3]      Plaintiff has not been able to identify the John Does.

Despite the fact that Plaintiff has alleged that it purchased and used the PCB-containing paint in or around 1954 <u>because</u> of the "valuable" properties of PCB-paint in an industrial facility, *id.* at ¶¶55, 135-36; Ex. E at 3, and despite being subsequently and repeatedly informed by regulatory authorities and environmental consultants between 1982 and 2007 of PCB contamination on its Property (including in "high concentrations"), Plaintiff has continuously asserted throughout this lawsuit that it was not aware of PCBs on its Property prior to 2008, which conveniently is two years prior to when it brought suit—the length of the statute of limitations period for its product liability claim.  General Statutes § 52-577c(b).

Plaintiff was told repeatedly that PCBs had been found on its Property (as early as 1982) and that further investigation and remediation were necessary.  Plaintiff, however, looked the other way for decades and did nothing to address PCBs on its Property or bring claims for alleged property damages until the EPA and DEEP became involved following the 2008 transformer incident.  Even though Plaintiff cannot identify the manufacturers of the paint that it claims contaminated its Property, Plaintiff has brought suit against Monsanto, claiming that the PCBs themselves were defective at the time of manufacture nearly 60-70 years ago.

Pursuant to the Court's Order, Defendants Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc. (collectively, "Defendants") have filed this omnibus dispositive motion pursuant to Federal Rules of Civil Procedure 56 and 12(c).  Doc. 65.  Plaintiff's claims should be dismissed in their entirety.  Plaintiff's claim under the Connecticut Product Liability Act ("CPLA") (Count I) is barred both by the CPLA's 10-year statute of repose and by the applicable two-year statute of limitations.   General Statutes §§ 52-577a(a), 52-577c(b).  Plaintiff's claim under the Connecticut Unfair Trade Practices Act ("CUTPA") (Count II) is precluded because the CPLA is Plaintiff's exclusive remedy for its alleged property damages

and, alternatively, the CUTPA claim is also barred by the applicable three-year statute of limitations.  General Statutes §§ 52-572n(a), 42-110g(f).  Because Plaintiff's CPLA and CUTPA claims should not survive, Plaintiff's claim for declaratory relief (Count III) should be dismissed because the Declaratory Judgment Act does not set forth an independent basis for relief.[4]

## II.  BACKGROUND

### A.  PROCEDURAL HISTORY

Plaintiff first filed this lawsuit on June 17, 2010.  *See* Complaint, Case No. 3:10-cv-00960-VLB (Doc. 1).  The parties entered into a tolling agreement, and the case was voluntarily dismissed on October 27, 2010 prior to any significant activity.  After the expiration of the tolling agreement, Plaintiff filed the instant action on January 22, 2013 (Doc. 1).  On March 29, 2013, Defendants filed a Motion to Dismiss the Complaint for the reasons set forth above (Docs. 18-19), which the Court granted following oral argument on June 12, 2013 (Doc. 34).

On July 11, 2013, Plaintiff filed an Amended Complaint (Doc. 38), asserting the same three claims for relief.  On August 1, 2013, Defendants filed a Motion to Dismiss the Amended Complaint (Doc. 42), explaining that Plaintiff failed to cure the defects in its original complaint, and its Amended Complaint should likewise be dismissed.  Doc. 42-1 at 1-2.  In its Opposition (Doc. 50), Plaintiff argued for the first time that the CPLA's 10-year statute of repose was preempted by federal law, specifically, section 9658 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  Doc. 50 at 1, 4-15.

The Court held a hearing on the Motion to Dismiss on November 27, 2013.  During that hearing, defense counsel maintained that the Court's resolution of the preemption argument pertaining to the CPLA's statute of repose may not be necessary in light of Defendants'

---

[4]    Plaintiff moved to strike certain of Defendants' affirmative defenses by claiming that they were waived because Defendants answered the Amended Complaint.  Defendants have filed an Opposition to this Motion at the same time as filing the instant motion.

4

alternative argument that Plaintiff's claims are also barred by the statute of limitations.  As a result, the Court denied Defendants' motion to dismiss without prejudice and authorized Defendants to file a motion for summary judgment setting forth all of the defenses in one motion—*i.e.*, the defenses as set forth in the motion to dismiss and the statute of limitations arguments.  Doc. 65; 11/27/13 Tr. (Doc. 74) at 12.

**B.    FACTUAL BACKGROUND**

**1.    Background on PCBs**

PCBs are chemical mixtures of up to 209 congeners.  Am. Compl. at ¶13; Answer (Doc. 69) at ¶13.  Section 6(e) of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2605(e), became effective January 1, 1977 and prohibited the manufacture, distribution, or use of PCBs except in a totally enclosed manner after January 1, 1978, unless specifically authorized by the EPA.  TSCA banned the manufacture and distribution of PCBs effective in 1979.[5]

**2.    History of Plaintiff's Chemical Business and PCBs on Its Property**

a.    Overview of Plaintiff's Operations

Plaintiff is a global chemical distributor that has owned its 16-acre Property located at 563 South Leonard Street in Waterbury since 1951, where it formulates, stores, and transports chemicals.  Ex. A; Am. Compl. at ¶¶80-81, 87.  Plaintiff's Property is split into two parts: (1) a westerly uphill portion (known as the "Upper Site"), which contains two buildings—the Main Building (consisting of the main office, production, and warehouse) and the Maintenance Building; and (2) a downhill portion (known as the "Lower Site") that contains the Tank Farm Building.  Am. Compl. at ¶¶82-84; *see* Roy F. Weston, Inc., *Final Site Inspection Report for*

---

[5]    Old Monsanto acquired rights to produce PCBs in 1935 and voluntarily ceased manufacture and sale of PCBs for all purposes approximately two years before the ban on manufacture and sale took effect in 1979.  Doc. 69 at ¶13.  Old Monsanto ceased the manufacture and sale of all PCBs used for plasticizer applications in 1970.  *Id.* at ¶20.

*Hubbard Hall Chemical Inc.* (Aug. 6, 1993) ("Weston Report"), Weston Figure 2, Hubbard-Hall

Site Sketch, (M_HHDOC001710) (copies of all Weston Report excerpts cited are attached as

Exhibit F).

The Tank Farm Building on the Lower Site was originally built in or around 1954 and

was partially rebuilt in approximately 1955 following damage from a flood.  *See* Am. Compl. at

¶85.   In its Amended Complaint, Plaintiff alleges that in or around 1954, Plaintiff, its

predecessor, or its agent painted the Tank Farm Building and its structures with paint that

contained PCBs "because of the unique features of PCBs that made them especially valuable for

use at a company in the business of the formulation, storage and distribution of chemical

products."  *Id.* at ¶136; Ex. E at 3.   The Tank Farm Building consists primarily of warehouse

areas for raw chemical storage in above-ground tanks and repackaging of these chemicals.  HRP

Associates, Inc., *Phase I Environmental Site Assessment Report* at 6 (June 27, 1997) ("HRP

Report") (HH 033332) (copies of all HRP Report excerpts cited are attached as Exhibit G).

   b.  1982:  First Notification of PCBs on Plaintiff's Property

Plaintiff first learned about the presence of PCBs on its Property over twenty-seven (27)

years before it initiated a lawsuit.  On September 3, 1982, an anonymous complaint was filed

with the DEP alleging that Plaintiff dumped about 8,000 gallons of solvents in a pit located on

the Lower Site of its Property (the same portion where the Tank Farm Building is located) in

mid-July 1982.  DEP Report of Complaint (attached as Exhibit H); Ex. F, Weston Report at 6

(M_HHDOC001712).  As part of DEP's investigation, it tested certain soil samples for PCBs.

The test results identified PCBs, specifically Aroclor 1254,[6] the same type of PCB for which

---

[6] Aroclor was Monsanto's trade name for a PCB mixture.  Am. Compl. at ¶16 ("Many
commercial PCB mixtures are known in the United States by the trade name Aroclor, which was
trademarked by Old Monsanto.").  There are many types of Aroclors, each with a unique suffix
number that indicates the degree of chlorination.  EPA, "Aroclor and Other PCB Mixtures,"

Plaintiff is now seeking damages.  Ex. H, at ALTA 000697; *see* Am. Compl. at ¶94.  Plaintiff was made aware of this anonymous complaint and subsequent report from DEP, and thus was on notice of PCBs found on its Property as early as 1982.  Indeed, Charles Kellogg, Plaintiff's Chairman, and Andrew Skipp, Plaintiff's President, admitted that they were aware of this incident and these findings.  Ex. B, Kellogg 9/30/13 Dep. Tr. at 209-12 (recalling being made aware of this complaint in 1982); Ex. D, Skipp 10/25/13 Dep. Tr. at 80-82 (stating he was aware of the PCB findings from 1982, and he probably became aware of this specific report in 1982).  Despite this awareness, there is no evidence that Plaintiff ever investigated the source or extent of the reported PCB findings.  *See* Ex. B, Kellogg 9/30/13 Dep. Tr. at 210-13 (not recalling what Plaintiff's follow-up investigation entailed, if anything).

c.    Mid-to-Late 1980s:  Plaintiff Becomes Embroiled in Superfund
Site Contaminated with PCBs that Threatened Its Business

A few years after being made aware of PCBs on its site, Plaintiff almost went out of business addressing liability for cleaning up a Superfund site in Massachusetts principally contaminated with PCBs.  *See id.* at 56, 160-61.  A significant part of Plaintiff's operations historically consisted of picking up spent, or used, chlorinated solvents from its customers, transporting the chemical waste to its Property—where it was temporarily stored, mixed, or repackaged—and then transporting the waste off-site for disposal.  *See id.* at 67-69, 159-61, 221-24; Ex. D, Skipp 10/25/13 Dep. Tr. at 48-53, 102-09.  One of the sites to which Plaintiff transported such waste was the Re-Solve Site in North Dartmouth, Massachusetts, a waste chemical reclamation facility.[7]  Ex. B, Kellogg 9/30/13 Dep. Tr. at 159-60.

---

*available at* http://www.epa.gov/osw/hazard/tsd/pcbs/pubs/aroclor.htm (last visited Feb. 2, 2014).

[7]    *See generally* EPA, "Waste Site Cleanup & Reuse in New England," Re-Solve, Inc., *available at* http://yosemite.epa.gov/r1/npl_pad.nsf/f52fa5c31fa8f5c885256adc0050b631/90413

In 1983, the EPA listed the Re-Solve site as a Superfund site, and PCBs were found at significant levels. *See* McGlennon Letter to Re-Solve Generators' Committee (May 6, 1985) (noting "extensive PCB contamination to levels of 4,500/ppm" produced from Plaintiff's file and stamped "RECEIVED May 8, 1985") (attached as <u>Exhibit I</u>).[8] Plaintiff was informed that PCBs were found on the site and was told that the cost to clean up the site could rise to $40 million because of the PCBs. *See id.*; Affiliated Chemical Group, Ltd., *Product, General Liability Loss Prevention & Safety Review*, at p. 1 (Nov. 7, 1988) (HH 033731) ("Latest figures for total site cleanup were in the area of $40,000,000.00 due to PCB's being involved") (excerpt attached as <u>Exhibit J</u>); *see also* Ex. D, Skipp 10/25/13 Dep. Tr. at 102.

Plaintiff was not only identified as a Potentially Responsible Party ("PRP") for the Re-Solve Site, but EPA also determined that Plaintiff was responsible for sending the <u>largest</u> percentage of drums to the site: 5,919 drums. *See* Hubbard-Hall Invoice Summary (HH 019970) (attached as <u>Exhibit K</u>) (showing 5,919 drums "[a]ttributed to Hubbard-Hall Chemical Co. in EPA NBAR for Resolve Site"); Resolve Contributors List (Mar. 16, 1984) (HH 021027) (attached as <u>Exhibit L</u>) (showing Plaintiff as the contributor with the largest percentage); *see also* Ex. B, Kellogg 9/30/13 Dep. Tr. at 159-60.  In an effort to save its business, Plaintiff took the extreme step of turning over the names of its customers to EPA.  Ex. B, Kellogg 9/30/13 Dep. Tr. at 160-61, 195.[9]  Plaintiff's customers and Plaintiff subsequently settled with EPA. *See* Ex. B, Kellogg 9/30/13 Dep. Tr. at 160; Ex. D, Skipp 10/25/13 Dep. Tr. at 96.

---

<u>2284A8A1E5A8525691F0063F6EF?OpenDocument</u> (last visited Feb. 2, 2014).

[8]     EPA, "History of Re-Solve, Inc. Superfund Site," *available at* <u>http://www.epa.gov/region1/superfund/sites/resolve/28270.pdf</u> (p. 3) (last visited Feb. 2, 2014).

[9]     During this time period, Plaintiff learned that some of the waste it had been receiving from its customers contained PCBs.  Indeed, Plaintiff produced a waste manifest from its files

Thus, as of the mid- to late-1980s, Plaintiff was well aware of the significant financial and regulatory consequences of finding PCBs on an industrial site, and, as a result, it is not surprising that Plaintiff ignored such contamination on its own site for the next two decades. *See* Ex. B, Kellogg 9/30/13 Dep. Tr. at 65-66 (testifying that when PCBs were found on the site in 2008, he was concerned because he knew that PCBs had been characterized as a possible carcinogen "through general industry readings, Chemical Week, just knowledge of the business"), 195 (aside from current situation, Re-Solve clean-up was most significant environmental issue for Kellogg in his career); Ex. C, Hart 10/2/13 Dep. Tr. at 29-31 (testifying that prior to the transformer incident in 2008, she knew PCBs were banned and were problematic because they do not break down in the environment), 61-62 (testifying that she would have known in the 1980s that if a site had PCBs, "the clean-up of the site would be more expensive"); Paul 10/10/13 Dep. Tr. at 47-48, 54-64 (testifying that he was familiar with PCBs in the early 1980s, had overseen the clean-up of PCBs at another site, had investigated transformer explosions and spills at 6-10 facilities around the country, and knew PCBs were alleged carcinogens) (copies of all deposition transcript excerpts of John Paul cited herein are attached as Exhibit N); Ex. D, Skipp 10/25/13 Dep. Tr. at 27-28 (he was aware of PCBs before 2008 in the context of General Electric's PCB contamination in a river; stating he knew PCBs were "a bad agent").

         d.    <u>1992-1993:  Second Notification of PCBs on Plaintiff's Property</u>

In 1992-1993, at the request of the EPA, an environmental consulting firm named Roy F. Weston, Inc. ("Weston") inspected Plaintiff's Property.  Weston searched files at DEP and

---

that showed that waste it had shipped had been rejected by a reclamation facility, which indicated with red writing on the first page:  "Will not accept PCB."  Skipp 10/25/13 Dep. Ex. 75 (attached as <u>Exhibit M</u>); *see also* Ex. B, Kellogg 9/30/13 Dep. Tr. at 227 (noting awareness that mixed oils were sent to Plaintiff and that "[i]t's going to have some crap in it.").

Region I EPA, interviewed town officials and individuals knowledgeable about the site history and characteristics, and spoke with other federal, state, and local agencies.  Ex. F, Weston Report at 1 (M_HHDOC001707).  In addition, Weston conducted a site inspection on September 24, 1992 and interviewed Plaintiff's personnel, including Margaret ("Marge") Hart, Plaintiff's Environmental Compliance Manager at that time and current Director of Administration.  Ex. C, Hart 10/2/13 Dep. Tr. at 71, 94-95, 104-05.  Weston collected a total of nine soil samples and two sediment samples from locations chosen based on Weston's observations and review of information collected.  Ex. F, Weston Report at 8 (M_HHDOC001714).

Soil samples SS-07 and SS-08 were taken at a depth of 8 inches on the Lower Site, near the Tank Farm Building (*i.e.*, the location that Plaintiff claims in its lawsuit is contaminated with PCBs, Am. Compl. at ¶¶93-97).   Ex. F, Weston Report at 4 (M_HHDOC001710), 22 (M_HHDOC001728).    PCBs were found in both locations in "high concentrations." Specifically, the Weston Report concluded:

> PCBs (Aroclor 1254) were detected at <u>high concentrations</u> in soil samples SS-07 and SS-08.  Aroclor 1254 was detected at 35.3 times the SQL in SS-07 (1,200 ug/kg) and 188.2 times the SQL in SS-08 (6,400 ug/kg).  <u>Hubbard-Hall has never used or generated waste containing PCBs and it is unknown what this contaminant may be attributed to</u>.

*Id.* at 29 (M_HHDOC001735) (emphasis added).  Specifically, these PCB findings were of the same type of PCB, Aroclor 1254, that Plaintiff claims it "discovered" in 2008 and for which it seeks damages in order to remediate.  *See* Am. Compl. at ¶¶93-97, 131-33.

The Site Sketch below, Figure 2 of the Weston Report (red circles added), shows the locations of samples SS-07 and SS-08.  SS-07 was taken close to the northwest corner of the Tank Farm Building (labeled "Aboveground Tank Farm"), and SS-08 was taken from the southwest side of the equipment staging area, across from the Tank Farm Building:



There is no dispute that Plaintiff received and reviewed the Weston Report in 1993. The

report was sent to Ms. Hart, who shared it with Charles Kellogg, Hubbard-Hall's Chairman, and

President at that time. *See* Ex. C, Hart 10/2/13 Dep. Tr. at 73-75 (Hart does not dispute that she

received the Weston Report, and that she reviewed it in 1993), 76 (Hart was "sure" she shared

the Weston Report with Charles Kellogg). Further, Ms. Hart, serving as a 30(b)(6) witness,

admitted that Plaintiff told Weston that Plaintiff did not know the source of the PCBs.  *Id.* at 94-95.

Thus, as of 1993, Plaintiff was aware that PCB contamination had been found on the Lower Site near the Tank Farm Building.  Plaintiff was also aware that the contamination was caused by a third party.  Despite this knowledge, Plaintiff did not investigate or take any other steps to determine from where the PCBs came and/or whether the contamination was present in other places on its Property.  *See* Ex. B, Kellogg 9/30/13 Dep. Tr. at 133 (testifying that he did not instruct anyone to do any follow-up work or investigation).  Indeed, one of Plaintiff's 30(b)(6) representatives confirmed that the company did nothing:

> Q. Okay. So, the Weston report contains test results indicating that the site was contaminated with PCBs, right?
> A. **Yes, there was PCB contamination on the site**.
> Q. And is it fair to say that as far as you know, no action was taken to either remediate or follow up – let's just start first, was there any action taken, as a result of the Weston report, to remediate the PCBs found on the site?
> A. **No**.

Ex. C, Hart 10/2/13 Dep. Tr. at 97-98 (emphasis added).

As evidence of Plaintiff's attempts to ignore the findings in the report, Plaintiff's top two executives (Kellogg and Hart) did not share the report with John Lannan, who joined Hubbard-Hall in the early 1990s and became the Environmental Compliance Manager in or around 1995, or with the executive who oversaw the Tank Farm Building.  Lannan 12/10/13 Dep. Tr. at 27-30, 36-37 (testifying that he would have expected to have seen environmental reports of the site and noting surprise that he had not seen the Weston Report before) (copies of all deposition transcript excerpts of John Lannan cited herein are attached as Exhibit O); Finelli 12/10/13 Dep. Tr. at 29-30 (copies of all deposition transcript excerpts of Anthony Finelli cited herein are attached as Exhibit P).  Indeed, Mr. Lannan testified that had he known about the PCB findings, it would

have been his responsibility to try to figure out what caused the contamination.  Ex. O, Lannan 12/10/13 Dep. Tr. at 31-33.

      e.      <u>1997:  Third Notification of PCBs on Plaintiff's Property</u>

In 1997, Plaintiff hired an environmental consultant, HRP Associates, Inc. ("HRP"), "to evaluate the potential for contamination of site soil, ground water and surface water resulting from site operations, use and conditions."  Ex. G, HRP Report at 1 (HH 033327).  The HRP Report summarized previous environmental reports issued for the Property, including Weston's.  The HRP Report specifically recounted the PCB contamination on Plaintiff's Property.  It stated:

> PCBs (Aroclor 1254) were detected at high concentrations in soil samples SS-07 and SS-08.  Aroclor 1254 was detected at 35.3 times the SQL in SS-07 (1,200 ug/kg) and 188.2 times the SQL in SS-08 (6,400 ug/kg).  The source for the PCBs does not appear attributable to Hubbard Hall manufacturing or waste generation practices.

*Id.* at 4 (HH 033330).  The HRP Report also noted that PCBs were detected "above background concentrations."  *Id.* at 9 (HH 033335).  In addition to pointing out the 1993 findings, the HRP Report also recounted the DEP's PCB findings of in 1982.  *Id.* at 32-33 (HH 033358-59).

As with the Weston Report, there is no dispute that Plaintiff received and reviewed the HRP Report in 1997.  Ex. C, Hart 10/2/13 Dep. Tr. at 146-51 (corporate representative testifying that she received and read the report, and she would have provided the HRP Report to Charles Kellogg and discussed its findings with him).  Indeed, the copy of the HRP Report maintained in Plaintiff's corporate files was highlighted, <u>including portions that specifically mentioned PCBs</u>. Ex. G, HRP Report at 4 (HH 033330).  When asked in discovery regarding the highlighting, Plaintiff responded that Ms. Hart was likely the one who highlighted the report in 1997 <u>and then shared the report (with her highlighting and notes) with Plaintiff's President</u>.  *See id.*; Pl.'s Obj. & Resp. to Defs.' Fourth Discovery Request at 2 (attached as <u>Exhibit Q</u>).  Specifically, the

13

highlighted text included the findings of PCB contamination in high concentrations right next to the Tank Farm Building and indicated that Plaintiff knew that the PCBs would have been generated by another party.

> PCBs (Aroclor 1254) were detected at high concentration in soil samples SS-07 and SS-08.  Aroclor 1254 was detected at 35.3 times the SQL in SS-07 (1,200 ug/kg) and 188.2 times the SQL in SS-08 (6,400 ug/kg).  The source for the PCBs does not appear attributable to Hubbard Hall manufacturing or waste generation practices.

Ex. G, HRP Report at 4 (HH 033330).  Thus, in 1997, Plaintiff was reminded of the PCBs found in high concentrations on its Property four years earlier.

As with the prior report, the HRP Report was not provided to either Plaintiff's Environmental Compliance Manager at the time, John Lannan, or the Tank Farm Manager.  *See* Ex. O, Lannan 12/10/13 Dep. Tr. at 27-30, 33, 36-37; Ex. P, Finelli 12/10/13 Dep. Tr. at 77; *see also* Ex. P, Finelli 12/10/13 Dep. Tr. at 57-58 (testifying that he would have wanted to know about any PCB findings around the Tank Farm Building).  As before, there is no evidence that Plaintiff took any action to investigate the extent or source of the PCBs that were identified in the HRP Report.  *See* Ex. B, Kellogg 9/30/13 Dep. Tr. at 133; Ex. C, Hart 10/2/13 Dep. Tr. at 152, 164.

f.   2000:  Fourth Notification of PCBs on Plaintiff's Property as Plaintiff Tells DEP that PCBs Are a "Site-Specific Contaminant of Concern"

In and around 2000, Plaintiff (through its President and also its environmental counsel) sent multiple letters to DEP confirming its awareness of PCBs having been found on its Property previously and promising that further testing would be done.

This correspondence began on May 16, 2000 when Plaintiff's environmental counsel, Joseph Wellington, sent a letter on behalf of Plaintiff to DEP stating, among other things, that it

14

hired ALTA Environmental Corporation ("ALTA") to investigate Plaintiff's Property.  This letter included ALTA's scope of work, which included screening soil samples and "submit[ting] selected samples for laboratory testing for the site-specific contaminants of concern revealed by earlier investigators" including PCBs.  5/16/2000 Wellington Letter to DEP (HH 034312-16, 034332-34) (emphasis added) (letter and one of its attachments attached as Exhibit R).  In other words, in a letter to DEP, Plaintiff identified PCBs as a "site-specific contaminant of concern" that had been found by earlier environmental investigations.  *See id.* at HH 034333.

In response, on July 19, 2000, DEP sent a letter to Plaintiff stating that the environmental assessment that had been conducted at the Property to date "indicates that the site may warrant clean-up under the federal Superfund program."  7/19/2000 DEP Letter (M_HHDOC001864-65) (attached as Exhibit S).  DEP requested that Plaintiff respond in writing by August 19, 2000 if it wished "to voluntarily assess and conduct cleanup" at the Property through the state remediation program.  *Id.* at M_HHDOC001865.

Less than a month later, Plaintiff's President, Andrew Skipp, responded to DEP by stating that Plaintiff elected to remediate the Property under General Statutes § 22a-133y.[10] 8/8/2000 Skipp Letter to DEP (M_HHDOC001866-69) (attached as Exhibit T).[11]  Plaintiff's President told DEP that the company was committed to addressing the environmental contamination identified at the Property:

---

[10]     General Statutes § 22a-133y sets forth one of two voluntary remediation programs in Connecticut, which "requires the submission of a remedial action plan and remedial action report to the Commissioner."  DEP, Voluntary Remediation Program, CGS section 22a-133y, *An Environmental Program Fact Sheet, available at* http://www.ct.gov/deep/cwp/view.asp?a=2715&q=325026&deepNav_GID=1626 (last visited Feb. 2, 2014).

[11]     Mr. Skipp testified that he would have given this letter high priority because it was going to DEP and he would have reviewed it in detail before sending it out.  Ex. D, Skipp 10/25/13 Dep. Tr. at 187-89.

15

To demonstrate our commitment to that work, you will find an ALTA letter contract enclosed below. That contract pertains to the first round of investigatory work, which has been undertaken at our tank farm. That contract demonstrates our commitment to addressing the environmental contamination, which has been identified at our property.

*Id.* (M_HHDOC001866). Plaintiff's correspondence included a scope of work stating that soil samples would be tested for PCBs because they were found by earlier investigators:

Specifically, the following work items are proposed at this time:

1. Visit the site to discuss soil conditions with your excavation contractor, and to mark out specific locations for investigations.

2. Undertake a two- to three-day soil boring and monitoring well installation program, locating explorations within potential release areas as may be identified, and otherwise on the downgradient (eastern) side of storage tanks, mixing areas, drains and other chemical handling features. Conduct a one-day soil vapor survey, to preliminarily evaluate subsurface conditions in locations that are inaccessible to a drill rig.

3. Screen soil samples for VOCs (including VOCs as DNAPL), and submit selected samples for laboratory testing for site-specific contaminants of concern (extractable total petroleum hydrocarbons, aromatic and halogenated VOCs, alcohols, organochlorine pesticides, PCBs, cyanide and plating metals), and for potential contaminants migrating from the former manufactured gas plant to the east (polynuclear aromatic hydrocarbons, PAHs).

*Id.* (M_HHDOC001868) (red outline added). Thus, Mr. Skipp stated that Plaintiff's newly hired environmental consultant (ALTA) would be testing for PCBs on its site, which ALTA characterized as a "site-specific contaminant[] of concern." *Id.*

Even though Mr. Skipp had extensive communications with DEP regarding PCB contamination, when deposed in this case, Mr. Skipp initially stated that he had no recollection of learning about PCBs on the Property prior to the transformer incident in 2008. Ex. D, Skipp 10/25/13 Dep. Tr. at 90-91. When confronted with his own correspondence, however, he testified that he must have been aware of PCBs in 2000:

Q. And now I have asked you whether reviewing the enclosure, which mentions PCBs, whether that refreshes your recollection about your knowledge of testing for PCBs on your site prior to 2008. Does it refresh your recollection or does it not?

16

MS. GIANQUINTO: Objection.
BY MR. WHITE: Q. Go ahead, sir.
A. All I know is that we were looking to address the problems that had been identified on the site and they were going to be tested. So I see that PCBs are in that listing, so I'm assuming that PCBs are part of that test.
**Q. Okay. So you were aware in 2000 of testing for PCBs on the Hubbard-Hall site?**
**MS. GIANQUINTO: Objection.**
**A. Based on what I'm reading here, yes.**

*Id.* at 195-96 (emphasis added).[12]  Accordingly, in 2000, Plaintiff was again aware that PCBs

were an issue on its Property.

g.   2001-2003:  Fifth Notification of PCBs on Plaintiff's Property Through Multiple Communications with Its Environmental Consultant (ALTA)

In 2000 and 2001, a third consultant, ALTA, conducted an environmental investigation of

the Property, took soil and groundwater samples, and had the samples analyzed for certain

contaminants of concern.    ALTA sent multiple scope-of-work proposals that specifically

included screening soil samples for PCBs.  *See* 2/1/2000 ALTA Scope of Work, at HH 034458

(HH 034457-59) (attached as Exhibit U); 5/2/2000 ALTA Fax to Wellington, at HH 013459

(attached as Exhibit V); 5/16/2000 ALTA Fax to Plaintiff (HH 013465-66) (attached as Exhibit

---

[12]    When subsequently asked about Plaintiff's counsel's letter to DEP in 2000 also identifying PCBs as a "site-specific contaminant of concern," Mr. Skipp testified as follows:

Q. In looking at this document, does that refresh your recollection in any way about whether you knew in 2000 that PCBs had been identified as a site specific contaminant of concern for earlier investigators?
MS. GIANQUINTO: Objection.
A. Yes.
BY MR. WHITE:
Q. And now reviewing this document, is it fair for me to assume you knew in 2000 that earlier investigators had identified PCBs as a site specific contaminant or concern?
MS. GIANQUINTO: Objection.
A. There was identified as a contaminant on our facility, yes.

Ex. D, Skipp 10/25/13 Dep. Tr. at 201-02.

W).  Included in this correspondence are multiple citations to the prior PCB contamination in samples SS-07 and SS-08 (originally from the 1993 Weston Report), and statements that ALTA was conducting further testing for PCBs, along with other contaminants of concern, on the site. *See id.*

ALTA also corresponded with Plaintiff during this time period regarding closing a hazardous waste container storage area in the Tank Farm Building.  On March 12, 2001, ALTA sent Plaintiff, to Ms. Hart's attention, a proposal for environmental consulting services related to this closure.  ALTA stated that it would perform site characterization sampling and testing, including collecting two concrete composite samples for testing for certain contaminants of concern, specifically PCBs.  3/12/2001 ALTA Proposal Re Closure of Hazardous Waste Container Storage Area (HH 034392-95) (attached as Exhibit X).  The proposal also contemplated testing flooring samples for PCBs.  *Id.* at HH 034394.

In April 2001, Mr. Skipp, President of Plaintiff, signed a "Closure Site Characterization Work Plan for Container Storage Area for Waterworks Waste," which work was to take place in the Tank Farm Building.  This work plan explicitly called for analyzing two concrete samples for certain contaminants of concern, including PCBs.  ALTA, Closure Site Characterization Work Plan for Container Storage Area for Waterworks Waste, at p. 3 (April 2001) (HH 036576) (attached as Exhibit Y).  Thus, in April 2001, Plaintiff was even testing for PCBs inside the Tank Farm Building itself and was aware of at least the possibility of PCBs being contained in building materials.  *See id.*

In addition to Plaintiff's awareness of PCBs during this time period, prior to issuing its finalized report, ALTA sent drafts of certain sections of its report to Plaintiff (specifically, Ms.

Hart), including drafts of the "Site Summary," which included the prior PCB findings reported by Weston and HRP.  *See* 5/1/2003 Fax (ALTA 1190-95) (attached as <u>Exhibit Z</u>).

Ultimately, ALTA issued its completed Phase II and partial Phase III Environmental Site Assessment for the Property in May 2003 – one report for the Upper Site and one for the Lower Site.  ALTA's Lower Site report pertains to the area including and around the Tank Farm Building and will be referred to here as the "2003 ALTA Report."  As with the HRP Report, ALTA recounted the PCB findings on the Lower Site by (1) DEP in 1982; and (2) Weston in 1993.  2003 ALTA Report at ii (HH 033006), 4-6 (HH 033013-15) (excerpts of the 2003 ALTA Report cited herein are attached as <u>Exhibit AA</u>).  Although ALTA did not detect PCBs in its sampling, the 2003 ALTA Report did not discount or question the PCB findings from the Weston Report.  *See id.*

To the contrary, ALTA concluded, both in its "Executive Summary" and in its "Conclusions and Recommendations," that:

> <u>Exceedances of the DEP default soil remediation standards were detected in the following areas, which warrant remediation or other action</u> (e.g., the placement of ELURs for a portion of the contamination after it is rendered "inaccessible soil" or "environmentally isolated soil" as defined by the DEP RSRs, which contaminated soil could then remain in place) should the RSRs apply to the lower site (e.g., due to a voluntary cleanup, the issuance of a DEP order, or the sale of the property which would trigger the Transfer Act):
>
> . . .
>
> • Shallow soil just southwest of the former South Loading Dock was found to be <u>contaminated with PAHs, pesticides and PCBs (designated as "Area TF5" of Figure 7)</u>.
>
> . . .

- Shallow soil (8 to 12 in.) near the northwesterly corner of the [tank farm] building was found to be <u>contaminated with PCBs</u> (designated as "Area TF8" on Figure 7).

*Id.* at 27-28 (HH 033036-37) (emphasis added).  Plaintiff even received a map in this report showing, "Possible Extent of Pesticide- , Metal-, <u>PCB</u>- and PAH-Contaminated Soil Exceeding Default Remediation Standards." *Id.* at Figure 7 (HH 33077) (emphasis added).

Plaintiff was told in 2003 that the PCB findings on its Property were above DEP's residential direct exposure criteria level (meaning that the Property could not be sold for residential use in this state) and that the Remediation Standard Regulations ("RSRs"), if applicable, would require remediation and/or a deed restriction on the Property.  *Id.* at ii (HH 033006), 27-28 (HH 033036-37).  Notably, the deed restriction mentioned by ALTA in 2003 is the very type of restriction that Plaintiff is seeking damages for in its diminishment of value claim in this lawsuit.  *See* Am. Compl. at ¶128, p. 25, ¶138; *see also* Ex. B, Kellogg 9/30/13 Dep. Tr. at 124; Ex. N, Paul 10/10/13 Dep. Tr. at 250-51; Meloy 30(b)(6) 10/17/13 Dep. Tr. at 124-25 (copies of deposition transcript excerpts of Kelly Meloy cited herein are attached as <u>Exhibit BB</u>); Binkhorst 11/18/13 Dep. Tr. at 90-92 (deposition transcript excerpts of Gordon Binkhorst cited herein are attached as <u>Exhibit CC</u>).

Moreover, ALTA recommended <u>further</u> investigation of certain contaminated areas, including these areas where PCBs were found:

> ***Additional Phase III investigations*** **into the degree and extent of soil and groundwater contamination (including NAPL) where remediation or other action is warranted under the RSRs, *are recommended in all of the aforementioned areas*.**  The additional investigations should be designed to delineate the areal and vertical extent of contamination, evaluate possible remedial or mitigative alternatives (including potential development of site-specific or alternative remediation standards) and associated costs, and support remedial recommendations and completion of necessary remedial actions.

Ex. AA, ALTA 2003 Report at 29 (HH 033038) (emphasis added); *id.* at ii-iii (HH 033006-07). Thus, as of 2003, Plaintiff had been told by a third environmental consultant that PCB contamination on its Property should be investigated and remediated.  As before, between 2003 and 2008, Plaintiff did no further Phase III investigations of the source of the PCBs or the extent of the PCB contamination.  *See* Ex. B, Kellogg 9/30/13 Dep. Tr. at 141-42 (Plaintiff did not want to pursue all of ALTA's recommendations at one time because "it would be disruptive . . . and it would [be] expensive"); Ex. C, Hart. 10/2/13 Dep. Tr. at 147-48, 229-30 (to do everything that ALTA recommended at once <u>would have been "too expensive," and noting that "Chuck Kellogg doesn't borrow money."</u>) (emphasis added).

> h.   <u>2004: Sixth Notification of PCB Contamination as DEP Again Notes PCB Contamination on the Property</u>

In February 2004, DEP conducted a RCRA Inspection of the Property.  *See* 2004 DEP RCRA Inspection Report (attached as <u>Exhibit DD</u>).  DEP subsequently issued a "RCRA (Hazardous Waste) Inspection Report" that concluded: "[t]he soils and groundwater are <u>significantly contaminated</u> with solvents, metals, petroleum products, pesticides and **polychlorinated biphenyls**" as noted in the excerpt below:

> Evidence of on-site disposal:  _X_ Yes   ____ No.  If yes, give specifics:  <u>The soils and groundwater are significantly contaminated with solvents, metals, petroleum products, pesticides and polychlorinated biphenyls.  At the upper site (chemical blending/laboratories and maintenance buildings), approximately 80 surface soil samples and soil borings and 12 groundwater monitoring wells have been installed.  In the upper</u>

*Id.* at 2 (emphasis added).

The 2004 RCRA Inspection Report also noted that DEP's contacts were Margaret Hart and John ("Jack") Paul, who were Plaintiff's primary environmental personnel.  *Id.* at 1. Mr. Paul, who had worked in the environmental field for over 40 years and had overseen a PCB contamination clean-up prior to joining Hubbard-Hall (Ex. N, Paul 10/10/13 Dep. Tr. at 58-64),

was asked at his deposition whether he was aware of any RCRA reports for Plaintiff that mentioned PCB contamination. Before being confronted at his deposition with the 2004 RCRA Inspection Report, Mr. Paul denied any such knowledge and stated that if he had been made aware of such a report, he "would have assessed whether or not it was a problem, and that assessment would have been fairly quick, based on what they said in their report[,]" and he then would have determined whether he needed to bring in a consultant on the issue. *Id.* at 137-39. Mr. Paul also stated that if a RCRA Inspection Report mentioned PCBs, he would have been alarmed "[b]ecause, to my knowledge, we didn't have any PCBs at the facility," and he would have shared this information with Charles Kellogg. *Id.* at 139.

When shown the 2004 RCRA Inspection Report and, specifically, its mention of PCB contamination on the Property, Mr. Paul stated: "The only explanation I can say is <u>maybe I missed that particular sentence or, for some reason, didn't pay attention, because I was more concerned about the VOCs and the chlorinated solvents</u>." *Id.* at 150-52 (emphasis added).

i.  <u>2004:  Seventh Notification of PCB Contamination on Plaintiff's Property as Plaintiff Notifies Its Insurance Carrier of PCB Contamination</u>

Later that same year, on October 25, 2004, ALTA sent a draft summary of its 2003 ALTA Report that explained the PCB findings to Plaintiff's insurance carrier, AIG, at Plaintiff's request. 10/25/2004 ALTA Fax to AIG (ALTA 001084-90) (attached as <u>Exhibit EE</u>). The summary for the 2003 ALTA Report included the following explanation of the PCB contamination:

22

Exceedances of the default soil remediation standards were detected in the following areas, which warrant remediation or other action should the RSRs apply to the lower site (e.g., due to a voluntary cleanup, the issuance of a DEP order, or the sale of the property which would trigger the Transfer Act):

- two large areas (beneath, south and east of the tank farm building, designated as Areas TF6A and TF6B on Figure 6), and one area of unknown size (located in the central portion of the lower site, designated as Area TF6C on Figure 6), contaminated with chlorinated volatile organic compounds (VOCs) and petroleum products, with non-aqueous phase liquid (NAPL) present in one of the large areas and in the area of unknown size;

- one area beneath the building and one area south of the building (designated as Areas TF2 and TF3 on Figure 7, respectively) contaminated with lead and polynuclear aromatic hydrocarbons (PAHs);

- one area east of the South Loading Dock and equipment storage area (designated as Area TF4 on Figure 7) contaminated with lead just above the water table;

- an area along the railroad spur (designated as Area TF1 on Figure 7) is contaminated with pesticides and PAHs;

- an area southwest of the South Loading Dock and equipment storage area (designated as Area TF5 on Figure 7) contaminated with PAHs, polychlorinated biphenyls (PCBs) and pesticides;

- an area along the drainage ditch is contaminated with PAHs, and soil near a concrete holding tank near the north end of the ditch (designated as Area TF7 on Figure 7) which may be contaminated with PAHs and pesticides; and

- an area near the northwest corner of the building (designated as Area TF8 on Figure 7) contaminated with PCBs.

*Id.* at ALTA 001089 (red outlines added).  Again, there is no dispute that Plaintiff was aware of and received these documents, as Ms. Hart was copied on this correspondence.  *Id.* at ALTA 1084; Ex. C, Hart 10/2/13 Dep. Tr. at 225-26.

> j.   2006-2007:  Eighth Notification of PCB Contamination on Plaintiff's Property When Another Environmental Consultant Finds PCBs in Water and Soil Samples on the Property

As late as 2006-2007 (3-4 years before this lawsuit was filed), Plaintiff was told by yet *another* environmental consultant that PCBs had been detected on its Property.  In 2006, soil sampling was done on the Property that revealed levels of PCBs, specifically Aroclor 1254 and Aroclor 1260 (the same types of PCBs that Plaintiff now claims has damaged its Property).  *See* Severn Trent, Summary of Analytical Results (5/16/2006) (HH 012630) (attached as Exhibit FF). This sampling was done by Malcolm Pirnie, Inc., who was hired by Plaintiff to implement a soil

vapor remediation system in the area of the Tank Farm Building in order to remediate another issue (*i.e.*, VOCs).  *See* Ex. BB, Meloy 10/17/13 Dep. Tr. at 87-88; Ex. CC, Binkhorst 11/18/13 Dep. Tr. at 71.  Water samples from the Property taken on April 25, 2007 by Malcolm Pirnie, Inc. also showed levels of PCBs, including Aroclor 1254 and Aroclor 1260.  Analytical Data for Malcolm Pirnie, Inc. (5/10/2007) (HH 012411) (attached as <u>Exhibit GG</u>).

<blockquote>
k.   2008:  Plaintiff Is Finally Forced To Address the PCBs on Its Property After the Transformer Incident
</blockquote>

On June 9, 2008, a storm broke a utility pole on an abutting property, causing a transformer owned by Connecticut Light & Power ("CL&P") to release approximately 49 gallons of PCB-containing oil onto the roof of the Tank Farm building.  Am. Compl. at ¶¶88, 103.  As a result of this incident, both CL&P and DEP collected and analyzed samples of oil, soil, and roofing material, and wipe samples of various structures in or around where the transformer incident occurred.  *Id.* at ¶¶93-95.  Two types of PCBs were discovered during this investigation in the immediate area of the Tank Farm Building:  Aroclor 1254 and Aroclor 1260. *Id.* at ¶¶94, 96.  DEP and EPA concluded that Aroclor 1254 was associated with paint used on the Property's structures and not with the transformer release.  *Id.* at ¶97.  CL&P concluded that the oil that spilled on the roof of the Tank Farm Building contained Aroclor 1260.  *Id.* at ¶89.

Plaintiff was ordered by EPA to remediate the PCBs on its Property and submit a work plan for the PCB mitigation and removal, which must be approved by EPA.  *Id.* at ¶¶109-13, 122-23; *see also id.* at ¶¶104-07.

### 3.   2010:  Plaintiff Finally Files a Lawsuit and Maintains Throughout that It Was Not Aware of PCBs on Its Property Until 2008

Despite its use of PCB-containing paint in 1954 because of the "valuable" properties of PCBs (Am. Compl. at ¶¶135-36); despite being repeatedly informed by regulators and environmental consultants over the course of at least twenty-five years (1982-2007) of PCB

findings on its Property, including in "high concentrations;" despite entering the Voluntary Remediation Program in 2000, in lieu of the Property being investigated further under CERCLA, under which Plaintiff obligated itself to further investigate and remediate its PCB contamination; and despite specifically being told in 2003 that it would need to further investigate its Property for PCBs and it would need to record a land use restriction on its Property due to PCBs, Plaintiff did not bring any claims for alleged property damage from PCB contamination until 2010.

Moreover, Plaintiff has brazenly maintained throughout this lawsuit that it was unaware of PCB contamination on its Property until the results of the soil and wipe samples that were taken and analyzed after the June 2008 transformer incident showed the presence of PCBs, specifically Aroclor 1254 and 1260.   Such representations by Plaintiff to the Court and Defendants in both pleadings and sworn testimony have continued even after discovery showed otherwise:

- "Hubbard-Hall was not aware of the presence of PCBs on its property until it received the results of CL&P's testing in or about August 2008." Plf.'s Mem. of Law in Opp. to Motion to Dismiss (Doc. 24) at 1 (Apr. 19, 2013);

- "Hubbard-Hall first became aware that PCBs likely were present on the Property on or about June 9, 2008, when a utility pole on an abutting property broke during a storm and caused a transformer to leak PCB-containing oil onto the Property." Ex. E at 2 (June 5, 2013) (sworn by Charles Kellogg);

- "Hubbard-Hall was not aware of the presence of PCBs on its property until it received the results of CL&P's testing in or about August 2008." Am. Compl. at ¶88; Plf.'s Mem. of Law in Opp. to Motion to Dismiss Am. Compl. (Doc. 50) at 2 (Sept. 4, 2013);

- "The PCBs have migrated into the concrete of the building itself as well as the surrounding soil.  The contamination was not discovered until after June 2008, when a transformer on an adjacent property fell onto the roof of the Tank  Farm Building during a storm."  Plf.'s Response to Defendants' Motion for Telephonic Status Conference (Doc. 75) at 2 (Jan. 22, 2014).

Indeed, as late as June 2013, Plaintiff stated that it had <u>no</u> documents in its possession prior to 2009 that related to or mentioned PCBs.  *See* Ex. E at 2.[13]

### III.   ARGUMENT

#### A.   LEGAL STANDARD

The purpose of summary judgment is to avoid "protracted, expensive and harassing trials."  *See, e.g.*, *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).  A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

As discussed during the telephonic conference, Defendants are renewing arguments set forth in their Motion to Dismiss the Amended Complaint (Doc. 42) and Reply to Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss (Doc. 51), and are also making additional arguments justifying summary judgment.  For purposes of brevity, Defendants have referenced prior briefs, where applicable, as opposed to repeating all of the arguments again.

Some of the arguments made in Defendants' prior motion to dismiss are being made pursuant to Rule 12(c) as opposed to Rule 12(b)(6) because Defendants have answered the complaint.  The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the

---

[13]    Plaintiff's three top executives all testified at their depositions that they were surprised upon learning that PCBs were discovered on the Property in 2008.  *See* Ex. B, Kellogg 9/30/13 Dep. Tr. at 114; Ex. C, Hart 10/2/13 Dep. Tr. at 17; and Ex. D, Skipp 10/25/13 Dep. Tr. at 90-91. Significantly, none of them denied receiving the documents outlined above.

same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim.[14]  *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009).  "To survive a Rule 12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.'"  *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Bald assertions and mere conclusions of law do not suffice to meet the alleging party's pleading obligations.  *See Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006).  The "plausibility standard" in *Twombly* "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[15]

### B.   DEFENDANTS' CPLA CLAIM SHOULD BE DISMISSED EITHER THROUGH SUMMARY JUDGMENT OR THROUGH A JUDGMENT ON THE PLEADINGS

#### 1.   Plaintiff's CPLA Claim Is Barred by the Statute of Limitations

As set forth during the November 27, 2013 status conference, this Court does not need to reach Defendants' statute of repose arguments if the Court agrees with Defendants' argument on the statute of limitations.  Specifically, the Court need not resolve the issue of whether the Federally Required Commencement Date ("FRCD") under CERCLA preempts the statute of repose because the same two-year statute of limitations applies in either case.

CERCLA's section 9658 provides that if a state law claim for property damage caused or contributed to by exposure to a hazardous substance (that was released into the environment

---

[14]   The defenses in the Motion to Dismiss that concern whether Plaintiff has failed to state a claim upon which relief may be granted should be reviewed under the 12(c) motion on the pleadings standard because they involve the sufficiency of the pleadings and not matters external to the pleadings.

[15]   If the court is offered and considers matters outside the pleadings, the 12(c) motion should be converted to a motion for summary judgment.  Fed. R. Civ. P. 12(d); *Nakahata v. New York-Presbyterian Healthcare Sys.*, 723 F.3d 192, 202-03 (2d Cir. 2013).

from a facility) imposes a limitations period that starts earlier than the FRCD, then the FRCD applies in lieu of the date specified by the state statute.  42 U.S.C. § 9658(a)(1).  The FRCD is the date the plaintiff knew (or reasonably should have known) that the property damages **"were caused or contributed to by the hazardous substance or pollutant or contaminant concerned."**  *Id.* at § 9658(b)(4)(A) (emphasis added).  Similarly, under Connecticut law, the courts look to when a plaintiff knew of an "actionable harm" (meaning when plaintiff knew or should have discovered through reasonable care that he or she has been injured by another's conduct).  *Champagne v. Raybestos-Manhattan, Inc.*, 212 Conn. 509, 520-21 (1989).  Thus, under both the FRCD and the CPLA, the accrual date is when Plaintiff knew, or should have known, that it had PCB contamination on its Property.[16]  *See, e.g., F.P. Woll & Co. v. Fifth & Mitchell Street Corp.*, 1999 U.S. Dist. LEXIS 894, at *31-32 (E.D. Pa. Feb. 4, 1999) (the FRCD "produces the same result as the Pennsylvania discovery rule"—meaning "the statute of limitations runs from the time contamination first occurs or reasonably should have been discovered").

Further, even if the FRCD applies, Connecticut law still controls with respect to the length of the limitations period.  *Durham Mfg. Co. v. Merriam Mfg. Co.*, 294 F. Supp. 2d 251, 277-78 (D. Conn. 2003).  The CPLA's two-year statute of limitations set forth in Connecticut

---

[16]     Plaintiff's alleged harm is the PCB contamination.  *See* Plf.'s Opp. (Doc. 50) at 21 ("Hubbard-Hall alleges that it suffered harm in the form of property damage caused by environmental contamination of its soil, and more significantly, the migration of PCBs into the structure of its Tank Farm Building."); Ex. E at 6 ("Hubbard-Hall has suffered damages associated with the PCB contamination of the Property, which was caused by the use of PCB-containing paint on the Tank Farm Building and other structures on the Property."); *cf. BellSouth Telecomms. v. W.R. Grace & Co.*, 77 F.3d 603, 610 (2d Cir. 1996) ("In abatement cases, the harm that allegedly results from the use of asbestos-containing products is the contamination of the building by asbestos and the consequent health risk to the building's occupants.") (internal quotation marks, citation, ellipses, and brackets omitted).

General Statute § 52-577c(b) applies because Plaintiff is claiming property damages caused by exposure to a hazardous substance, PCBs.  That statute provides in part:

> [N]o action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture of hazardous pollutant released into the environment shall be brought but within two years from the date <u>when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered</u>.

General Statutes § 52-577c(b) (emphasis added).

Therefore, Plaintiff's CPLA claim would be time-barred if the injury or damage to its Property by PCBs was either (1) discovered, or (2) in the exercise of reasonable care should have been discovered, before June 17, 2008 (two years before Plaintiff filed the lawsuit).  As noted below, summary judgment should be granted under either prong.  *See Crown v. Parker*, 462 U.S. 345, 352 (1983) ("Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights[.]"); *Zapata v. Burns*, 207 Conn. 496, 509 (1988) ("[O]ne of the purposes of a statute of limitations is to protect a defendant from finding himself in a situation where, because of the lapse of time, he is unable to gather facts, evidence, and witnesses necessary to afford him a fair defense.").

a.    <u>Plaintiff's CPLA Claim Is Time-Barred Because Plaintiff<br>Discovered PCB Contamination on Its Property Years Before 2008</u>

Plaintiff's claim accrued when it learned it had PCB contamination on its Property (*i.e.*, the alleged harm) and that it was caused by another.  *Bogdan v. Zimmer, Inc.*, 165 Fed. Appx. 883, 884-85 (2d Cir. 2006); *Calabrese v. McHugh*, 170 F. Supp. 2d 243, 248, 269 (D. Conn. 2001) (where plaintiff property owner sued prior owners for damages related to remediation of hazardous substances on property, the statute of limitations set forth in § 52-577c began to run when plaintiff learned of the contamination); *Bourbeau v. Alph Q, Inc.*, 2008 Conn. Super. LEXIS 1299, at *5 (Conn. Super. Ct. May 20, 2008) (granting summary judgment under § 52-

29

577c(b) because "[t]he court finds that no genuine issue of material fact remains that the plaintiff knew of the contamination more than three years before filing this action").  The evidence unequivocally shows that Plaintiff knew it had PCB contamination on its Property, and that it did not manufacture or generate the PCBs, for decades before bringing this suit on June 17, 2010.[17]

In 1954, Plaintiff, its predecessor, or its agent purchased and used paint that contained PCBs on its Tank Farm Building and structures because the properties of PCBs made them "valuable" to a chemical company.  Am. Compl. at ¶¶135-36; Ex. E at 3.  The record is replete with documents demonstrating that Plaintiff was repeatedly told by environmental consultants and regulators over the course of 25 years, from 1982 to 2007, that it had PCB contamination on its Property.  *See supra* at pp. 6-24.

After the manufacture of PCBs was banned in 1977, DEP informed Plaintiff in 1982 of findings of Aroclor 1254 on the Property.  Ex. H.  Plaintiff did no further investigation for PCBs at the time.  In 1983, Plaintiff was identified as a PRP for the Re-Solve Superfund Site for having transported waste from its Property to this site in Massachusetts, more drums than any other PRP.  *See* Exs. J & K.  The steep cost of remediating this site, estimated at approximately $40 million, was due to the presence of PCBs.  *See* Ex. I.  After a significant amount of work identifying its customers and providing EPA with this information to lessen its own liability, Plaintiff settled with EPA.  Plaintiff, a sophisticated global chemical distributor, and the most

---

[17]     It was not necessary for Plaintiff to know the specific identity of Defendants for its claims to accrue.  *See Cadlerock Props. Joint Venture v. Schilberg*, 2001 Conn. Super. LEXIS 1973, at *8-9 (Conn. Super. Ct. July 17, 2001); *Amland Properties Corp. v. ALCOA*, 808 F. Supp. 1187, 1192 (D.N.J. 1992) ("[t]hat the specific identity of a potential defendant is not a requirement for commencing an action . . . is now beyond argument[;]" "plaintiff can file a complaint naming 'John Doe' defendants if the actual identify of the wrongdoer is unknown").

significant PRP at this PCB site, was aware by the mid- to late-1980s that PCB contamination had to be cleaned up to certain levels and that remediation of PCBs can be costly.[18]

On the heels of settling its liability at the Re-Solve Superfund Site, Plaintiff was told in 1993 that it had PCBs in "high concentrations" in soil samples taken from two locations near the Tank Farm Building, and that the PCBs were not generated by Plaintiff so the source was unknown.  Ex. F, Weston Report at 29 (M_HHDOC001735).  Sample SS-07 was from the northwest corner of the Tank Farm Building and sample SS-08 was from near the south loading dock, across from the Tank Farm Building.  *Id.*

Plaintiff's Environmental Compliance Manager at the time, Margaret Hart, and its current Chairman and CEO/President at the time, Charles Kellogg, received and reviewed the Weston Report in 1993, but took no steps to further investigate the PCB findings or the specific source of the PCB contamination.  *See* Ex. C, Hart 10/2/13 Dep. Tr. at 74-75.  In other words, Plaintiff was aware of PCB contamination on its Property in "high concentrations" right next to the Tank Farm Building, and that waste generated by Plaintiff was not the source of the PCBs, in 1993. Yet Plaintiff took no action to further investigate the PCBs or make any claims against "the

---

[18]     It is undisputed that Plaintiff was aware of PCBs well before 2008 and, furthermore, was well aware of Monsanto.  Ex. B, Kellogg 9/30/13 Dep. Tr. at 65-66 (when PCBs were found on the Property in 2008, Mr. Kellogg was concerned because he knew that PCBs had been characterized as a possible carcinogen "through general industry readings, Chemical Week, just knowledge of the business."); Ex. C, Hart 10/2/13 Dep. Tr. at 24, 121-22 (Ms. Hart knew of Monsanto in the 1970s), 29-31 (prior to the transformer incident in 2008, she knew that PCBs were banned and were problematic because they do not break down in the environment); Ex. N, Paul 10/10/13 Dep. Tr. at 47-48 (Mr. Paul was familiar with PCBs in the early 1980s when he worked at PEI Associates before coming to Hubbard-Hall); Ex. D, Skipp 10/25/13 Dep. Tr. at 27-28 (Mr. Skipp was aware of PCBs before 2008 and knew PCBs were "a bad agent."); *see, e.g.*, *Electric Power Bd. of Chattanooga v. Monsanto Co.*, 1987 U.S. District LEXIS 13365, at *3 (E.D. Tenn. Apr. 30, 1987) ("[I]nformation about the hazards of PCBs has been a matter of public record for years and it appears that the plaintiffs had actual knowledge of the presence of PCBs in their equipment, and the hazards that entailed, as early as 1976.  In the opinion of the court, any attempt to pursue the fraudulent concealment allegation would be fruitless.").

exclusive manufacturer of PCBs in the United States" before PCBs were banned in 1977.  Am. Compl. at ¶¶15, 20.

In 1997, the HRP Report <u>again</u> reported these PCB findings in "high concentrations" to Plaintiff.  Ex. G at 4 (HH 033330); Ex. C, Hart 10/2/13 Dep. Tr. at 36.  Like the Weston Report, the HRP Report was reviewed by Ms. Hart as well as Mr. Kellogg.  Someone in Plaintiff's upper management, likely Ms. Hart, highlighted important findings in the HRP Report around the time the report was received, including the finding that PCBs had been detected at high concentrations near and adjacent to the Tank Farm Building.  *See supra* at pp. 13-14.  Neither the Weston Report nor the HRP Report was shared with Plaintiff's Environmental Compliance Manager in the 1990s, John Lannan, or its Tank Farm Manager, Anthony Finelli.  *See supra* at pp. 12-14. Plaintiff was aware in 1997 of PCB contamination on its Property and that it was caused by another.

In 2000, Plaintiff received a letter from DEP stating that the Property would fall under the CERCLA program unless Plaintiff entered Connecticut's Voluntary Remediation Program.  Ex. S.  Andrew Skipp, Plaintiff's President, sent a letter to DEP on August 8, 2000 in response, stating that Plaintiff was entering the Voluntary Remediation Program and enclosing a proposed scope of work for further investigation of contaminants that had been found on the site.  Ex. T. Explicitly included in this list of contaminants found on the site (which Plaintiff informed DEP that it would investigate) was PCBs.  *Id.* at M_HHDOC001868.  Plaintiff was aware of PCB contamination on its site in 2000, and that the presence of PCBs on its Property required further action from Plaintiff to comply with environmental laws and regulations.  *Dennis v. ICL, Inc.*, 957 F. Supp. 376, 380 (D. Conn. 1997) ("[O]nce the plaintiff discovers some form of injury, the statute of limitations begins to run, even when the plaintiff has not yet discovered the full

manifestation of that injury.") (internal quotation marks and citation omitted).  Nevertheless, Plaintiff did not bring a claim for any damages related to the PCB contamination at this time.[19]

Between 2000 and 2003, ALTA corresponded with Plaintiff on its scope of work and investigation of the Property.  Included in this correspondence are multiple references to the prior PCB findings in samples SS-07 and SS-08, and statements, including contracts, stating that ALTA was conducting further testing for PCBs, along with other contaminants of concern, on the Property.  *See* Exs. U-W.

ALTA also corresponded with Plaintiff during this time period regarding closing Plaintiff's hazardous waste container storage area in the Tank Farm Building.  On March 12, 2001, ALTA sent Plaintiff a proposal for services related to this closure.  Ex. X.  ALTA stated that it would perform sampling and testing, including collecting two concrete composite samples and testing them for certain contaminants of concern, underline specifically PCBs.  *Id.*  The proposal also contemplated testing flooring samples for PCBs.  *Id.* at HH 034394.  In April 2001, Mr. Skipp, President of Plaintiff, signed a Closure Site Characterization Work Plan for Container Storage Area for Waterworks Waste, which work was to take place in the Tank Farm Building.  Ex. Y.  This work plan called for analyzing two concrete samples for certain contaminants of concern, underline including PCBs.  *Id.* at HH 036576.  Not only do these documents reiterate that PCBs were a

---

[19]     Plaintiff did not provide DEP with any filings pursuant to the Voluntary Remediation Program, including a closure report, and is therefore still subject to the program.  *See* Ex. Q at 2 (stating that Plaintiff produced all documents in its possession relating to its actions under the Voluntary Remediation Program).  Because Plaintiff has been in the Voluntary Remediation Program since 2000, it has been required to comply with the RSRs, including remediating PCBs to levels required by the RSRs and/or recording a land use restriction on its Property, restricting it to industrial use.  *See* General Statutes §§ 22a-133k, 22a-133y.  Entering the Voluntary Remediation Program "triggers" application of the RSRs to the Property, General Statutes § 22a-133y, as ALTA explained in its 2003 ALTA Report.  Ex. AA, 2003 ALTA Report at pp. ii (HH 033006), 27-28 033036-37).

"contaminant of concern" for the Property, specifically the Tank Farm Building, but also that Plaintiff knew that PCBs could be in building materials.

In May 2003, ALTA issued its report for the Property, which again informed Plaintiff of the PCBs that were found by Weston in samples SS-07 and SS-08. The report also explained that the levels of PCBs that were found exceeded DEP's residential DEC.[20] Ex. AA, 2003 ALTA Report at ii (HH 033006) & 4-6 (HH 033013-15). ALTA did not dispute or question these PCB findings. *See id.* To the contrary, ALTA recommended further investigation in the areas where PCBs had been found. *Id.* at 27-29 (HH 033036-38). ALTA explained that if the RSRs were triggered, such as by Plaintiff entering the Voluntary Remediation Program or by transferring the Property (and therefore subjecting the Property to Connecticut Transfer Act's requirements), Plaintiff would have to clean up listed contaminants to acceptable levels and/or put a deed restriction on its Property restricting it to industrial use. *See id.* One of the contaminants listed was PCBs. *Id.*

Accordingly, in 2003, Plaintiff knew that the PCB contamination on its Property would have to be remediated and/or it would be obligated to file a deed restriction on its Property because of the PCB contamination. Significantly, as part of its damages in this case, Plaintiff claims that the presence of PCBs on its property has led to a diminution of property value because of the required deed restriction. Am. Compl. at ¶128, p. 25, ¶138; Ex. B, Kellogg 9/30/13 Dep. Tr. at 124; Ex. N, Paul 10/10/13 Dep. Tr. at 250-51; Ex. BB, Meloy 10/17/13 Dep.

---

[20]    The DEC is the direct exposure criteria, which are criteria established by DEEP to protect human health from exposure to contaminants in soil. The RSRs set forth the standard to which polluted soil must be remediated—the "Residential Direct Exposure Criteria"—unless the site is used exclusively for industrial or commercial purposes, in which case the less stringent industrial/commercial DEC may be used if the site has an Environmental Land Use Restriction recorded on the land records to ensure that the site will not be used for residential purposes in the future. CT DEEP, Remediation Standard Regulations, *An Environmental Program Fact Sheet*, *available at* http://www.ct.gov/deep/cwp/view.asp?A=2715&Q=325014.

Tr. at 124.  Plaintiff was on notice of these damages in 2003, if not earlier.  Finally, Plaintiff was told in 2006-2007 (again, over 2 years before it filed this suit) by another consultant that PCBs were found on the Property.  Exs. FF & GG.

Ultimately, all of this evidence (taken separately or together) warrants the entry of summary judgment because Plaintiff discovered the alleged harm or injury to its property years before 2008.  *See Syms v. Olin Corp.*, 408 F.3d 95, 110-11 (2d Cir. 2005) (plaintiff knew about presence of PCBs on property for purposes of when its claims accrued when documents had reported on the presence of PCBs on the site and plaintiff had written a letter to President Clinton mentioning that existing surveys showed the types of contaminants that had to be removed); *Calabrese v. McHugh*, 170 F. Supp. 2d 243, 258 (D. Conn. 2001) (dismissing tort claims based on environmental contamination on statute of limitations grounds because "plaintiff had actual knowledge of the existence of environmental contamination" on the property in 1989, the same year an environmental consultant "recommended to plaintiff that further testing and investigation of the site be performed"); *Amland v. ALCOA*, 808 F. Supp. 1187, 1192-95 (D.N.J. 1992) (claims against Monsanto and other third-party defendants for costs of remediating PCB contamination barred by statute of limitations where plaintiff knew by April 1985 it had PCBs on its property because it received an environmental report in 1985 stating that an investigation showed "significant concentrations of PCBs" on the site, and also in 1985, plaintiff notified regulatory authorities "of the existence of PCBs at the site"—yet plaintiff "sat on its haunches and waited for over six years to bring direct claims against the third-party defendants").[21]

---

[21]     *See also Estate of Maglione v. Gulf Oil Corp.*, 2007 N.J. Super. Unpub. LEXIS 1059, *3-4, *20-23 (N.J. Super. Ct. App. Div. Feb. 22, 2007) (plaintiff's claims to recover costs of remediating contamination on its property barred by statute of limitations where plaintiff knew in 1990 that its underground storage tanks had contaminated the property—when an environmental consultant notified plaintiff that "additional tests or corrective measures would likely be needed

The facts in this case are similar to those in *Quadion Corp. v. Mache*, 1991 U.S. Dist. LEXIS 8222 (N.D. Ill. June 11, 1991), where plaintiff's tort actions were barred by the statute of limitations. In that case, EPA's letter and complaint to plaintiff regarding "unacceptable levels of PCB in sludge samples taken from the facility's sumps and trenches," after EPA took "a limited number of samples from the facility" was enough to put plaintiff "on sufficient notice of the presence of PCB contamination on its property to commence the limitations period." *Id.* at *13-14. Significantly, the court's holding noted that the statute of limitations expired even though at that time plaintiff did not know that PCBs were present in other areas on its property— specifically, "in and outside the building, in the soils, in the concrete and even underneath the parking lot." *Id.* at *13. The court explained that given the results provided by EPA, plaintiff "should have further realized that other areas of the property could have been contaminated with PCBs[,]" and given that plaintiff "states that it has never used hydraulic fluid containing PCBs[,] . . . [it] should have become immediately suspicious of the previous owners and operators of the facility[,]" who were named as defendants. *Id.* at *14.

Likewise, here, Plaintiff was on notice as early as 1982 that it had PCB contamination, and again in 1993 that it had PCBs in "high concentrations" and that the source of the PCBs was not Hubbard-Hall. By 2003, Plaintiff and its environmental consultant and counsel were aware of the PCB contamination on the Property, and that remediation and a deed restriction would be required to comply with environmental laws and regulations. Plaintiff still did not remediate or place the deed restriction on the Property, nor did Plaintiff bring its claims for property damages due to PCB contamination. The statute of limitations on Plaintiff's CPLA claim expired well before a lawsuit was filed.

---

to discover the full extent of the contamination"—but plaintiff "did nothing to discover the full extent of the contamination[]" and did not file the complaint until 2002).

b.      Alternatively, Plaintiff Reasonably Should Have Discovered PCB
        Contamination on Its Property Prior to June 2008

Alternatively, a cause of action also accrues when a plaintiff reasonably should have known of the actionable harm.  General Statutes § 52-577c(b).  The phrase, "should have been discovered," means when the plaintiff had knowledge of facts that would have put a reasonable person on notice of the nature and extent of the harm, and that the harm was caused by another's negligent conduct.  *Bogdan v. Zimmer, Inc.*, 165 Fed. Appx. 883, 884 (2d Cir. 2006).  The plaintiff does not need to know the full extent of the harm in order for the claim to accrue.  *See BellSouth Telecomms. v. W.R. Grace & Co.*, 77 F.3d 603, 614 (2d Cir. 1996) (under Connecticut law, injury is first sustained "when a party suffers *some form of actionable harm*.  The harm need not have reached its fullest manifestation before the statute begins to run.") (italics in original) (internal quotation marks and citation omitted).

Although the issue of whether a party "should have discovered" harm is typically a question of fact, summary judgment is appropriate when the evidence unambiguously shows that the plaintiff should have been aware of the actionable harm.  *See*, *e.g.*, *id.* at 611 n.6 (affirming summary judgment on statute of limitations grounds where plaintiff knew that it had asbestos contamination and knew or should have known it came from defendant's fireproofing product due in part because plaintiff "could have determined the supplier by analyzing samples of the fireproofing"); *Vector-Springfield Props., Ltd. v. Cent. Ill. Light Co.*, 108 F.3d 806, 809-10 (7th Cir. 1997) (affirming summary judgment and finding plaintiff's claims for damages from contamination on its property barred by statute of limitations where plaintiff had adequate notice of the contamination based on a consultant's letter, which had recommended a preliminary investigation of the affected property); *New West Urban Renewal Co. v. Viacom, Inc.*, 230 F. Supp. 2d 568, 574-75 (D.N.J. 2002) (granting defendant's motion for summary judgment, based

37

on New Jersey's discovery rule for environmental contamination claims, where plaintiff "was given reasonable notice of environmental hazards" on its property through environmental reports that stated there "was an asbestos problem, . . . some PCBs in there, and a couple of tanks").

The evidence is clear that Plaintiff was informed—by DEP—that PCBs were found on its Property in 1982, when DEP provided the report and testing results following the anonymous complaint that 8,000 gallons of solvent were dumped on the site.  Ex. H.  This report was enough to put Plaintiff on notice that its Property was contaminated with PCBs and to investigate further and bring a cause of action for any damages.  For example, in *Vector-Springfield Props., Ltd. v. Cent. Ill. Light Co.*, 108 F.3d 806 (7th Cir. 1997),[22] the Seventh Circuit Court of Appeals found that the plaintiff had adequate and timely notice of environmental contamination based on a consultant's letter, which had recommended a preliminary investigation of the affected property, a former gas plant site, based on the consultant's conclusion that "waste products from such facilities often affected property 'well beyond the site boundaries.'"  *Id.* at 809-10.  Even though this letter did not explicitly state that the property was contaminated, the court concluded that "the only reasonable inference to be drawn from these undisputed facts . . . is that a reasonable person, possessed of such a letter, would be put on notice of its injury and that it should determine whether legally actionable conduct was involved."  *Id.* at 810.  The court rejected

---

[22]      The Seventh Circuit Court of Appeals applied the discovery rule in Illinois, which gives an accrual date similar to General Statutes § 52-577c(b).  "Under the Illinois 'discovery rule,' the statute of limitations on Vector-Springfield's claims began to run when Vector-Springfield became possessed of sufficient information concerning its injury to put a reasonable person on inquiry to determine whether actionable conduct was involved[,]" meaning "1) that [Vector-Springfield] knew or should have known of an injury to their property . . . and 2) that the contamination resulted from another's conduct."  *Vector-Springfield*, 108 F.3d at 809 (internal citations omitted).  The court explained that this meant it must determine the date plaintiff "obtained this knowledge or should have obtained this knowledge and therefore [was] under an obligation to inquire further to determine whether an actionable wrong was committed."  *Id.* (internal quotation marks and citation omitted).

plaintiff's argument that the statute of limitations did not accrue until the environmental consultant had conducted and reported to plaintiff its observations and sampling results. *Id.* The test for accrual under the discovery rule is not whether plaintiff was certain it had been injured; "knowledge of possible injury is sufficient to trigger the limitations period." *Id.* at 810 n.3.

Likewise, the 1993 Weston Report informed Plaintiff that it had PCBs on its Property, specifically Aroclor 1254, in "high concentrations." Ex. F at 29 (M_HHDOC001735). This was sufficient to put a reasonable person on notice of the contamination and lead him or her to investigate further. A 1993 guidance document from DEP that was produced from Plaintiff's files explains how to use wipe samples to test for various contaminants. This 1993 guidance document explains that wipe sampling is the recommended "procedure to sample non-porous material to verify that media closure criteria have been achieved after decontamination or removal has been completed. Examples of non-porous material are: steel or fiberglass tanks, structural steel (painted or unpainted)." DEP, 1993 Draft RCRA Closure Plan Guidance document for Container Storage Areas and Tank Systems: Attachment A (HH 034532) (excerpts attached as Exhibit HH). This list specifically mentions how to test for PCBs and states that all contaminants of concern should be analyzed. *Id.* This "how-to" guidance document from DEP from 1993 was not only publicly available, but was produced from Plaintiff's files.

Moreover, although Hubbard-Hall's Environmental Compliance Manager in the mid-1990s, John Lannan, was not informed of the Weston Report (much to his surprise when he was first shown the report during his December 10, 2013 deposition), he testified that had he been aware of these PCB findings, he would have followed up and would have taken steps to try to determine the source of the PCBs. Ex. O, Lannan 12/10/13 Dep. Tr. at 29, 31-32. When a plaintiff is put on notice of its harm and "a plaintiff of ordinary prudence" could readily learn

"information that would lead to the discovery of a cause of action through due diligence," the plaintiff has incurred actionable harm, and the statute of limitations begins to run. *Mountaindale Condo. Ass'n v. Zappone*, 59 Conn. App. 311, 322, 327 (2000) (no genuine issue of material fact that plaintiff knew of the actionable harm, when he knew in 1989 there were problems with the construction of fire walls of condo units, "although he did not know of the specific violation of the building code until years later[,]" because "in 1989, the means of knowledge existed and the circumstances were such as to put a plaintiff of ordinary prudence on inquiry").

For example, in *OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 521-22 (D. Conn. 2007), the court held that plaintiff's actionable harm occurred when the plaintiff knew it had contamination on its site, not when it discovered that the contamination was migrating from defendants' property. The court explained:

> Simply because OBG says it did not fully understand the true extent of pollution on its Property is irrelevant in determining when OBG's cause of action accrued. Indeed, a decision OBG itself cites expressly states that the "statute of limitation runs . . . under . . . § 52-577c(b) . . . from . . . the date the plaintiff acquired the property with knowledge of its contaminated state." The "fact that it later became apparent that the damage was somewhat more extensive than first suspected is of no moment."

*Id.* at 521 (internal quotation marks and citations omitted).

Similarly, in *Mountaindale Condo. Ass'n*, when the president of the plaintiff's board of directors sent a memo to plaintiff's property manager in 1989 regarding a lack of firewalls in the condominium units, this was sufficient to require the plaintiff to "make reasonable efforts to discover whether there were building code violations and bring an action within the time frames of the statutes of limitations." *Mountaindale Condo. Ass'n* 59 Conn. App. at 327. Likewise, here, in 1993, Plaintiff was informed of "high concentrations" of PCBs in two soil sample locations near the Tank Farm Building, years after the manufacture of PCBs had been banned.

Ex. F at 4 (Figure 2) (M_HHDOC001710), 29 (M_HHDOC001735).   At that time, Plaintiff reasonably should have ascertained the specific source and extent of the PCB contamination and brought any claims for damages.  It chose, however, not to do so.[23]

Moreover, in 2003, ALTA recommended that Plaintiff conduct further investigations on its Property to determine the extent of the PCB contamination, and advised Plaintiff that it would be required to remediate the PCBs and/or put a land use restriction on the Property because of the PCB contamination.  Ex. AA, 2003 ALTA Report at ii (HH 033006), 4-6 (HH 033013-15).  Apparently due to concerns about the expense, Plaintiff failed to pursue ALTA's recommendations to investigate the PCBs further, remediate the PCBs, record a land use restriction on the Property as required by the RSRs, or bring any claim for damages due to the PCB contamination. *See* Ex. B, Kellogg 9/30/13 Dep. Tr. at 141-42 (Plaintiff did not want to pursue all of ALTA's recommendations at one time because "it would be disruptive . . . and it would [be] expensive"); Ex. C, Hart. 10/2/13 Dep. Tr. at 229 (to do everything that ALTA recommended at once would have been "too expensive," and noting that "Chuck Kellogg doesn't borrow money.") (emphasis added).

The issue is not when Plaintiff received any particular sampling results or was convinced of the severity of the contamination, but rather, is "whether there are enough indications of environmental contamination to put the plaintiff on reasonable notice of a need to investigate

---

[23]     Regarding the 1997 HRP Report's citation to DEP's PCB findings in 1982, Ms. Hart provided the following testimony:

> Q. Do you have any recollection, in 1997, of reading this report and being aware that PCBs were found as early as 1982, on the site?
> A. **Again, it's just like the other report. It was there. Did it register as significant? It just didn't register with me.**

Ex. C, Hart 10/2/13 Dep. Tr. 161 (emphasis added).

further." *New West Urban Renewal Co. v. Viacom, Inc.*, 230 F. Supp. 2d 568, 573 (D.N.J. 2002); *see id.* at 574-75, n.11 (explaining that "[t]he statute of limitations, however, is triggered by a plaintiff's knowledge of material facts, not by conclusive proof of every relevant fact") (internal citations and quotation omitted).[24]  Plaintiff reasonably should have taken steps in 1982, 1993, 1997, and 2003 to further investigate these PCB findings and remediate the contamination.

Plaintiff attempts to justify its failure to act by asserting that it did not know that the PCBs came from the paint.   Significantly, however, Plaintiff is suing Monsanto for manufacturing the <u>PCBs</u>, not the paint.  Therefore, knowing that the PCBs came from the paint specifically was not necessary for bringing these claims against the Defendants for PCB contamination.[25]  Yet, even if that knowledge were required, sample SS-07 was located right next to the northwest corner of the Tank Farm Building.  Plaintiff, in the exercise of reasonable care, should have taken wipe samples from the Tank Farm Building to determine the source and extent of the PCB contamination.  *OBG Tech. Servs.*, 503 F. Supp. 2d at 521-22 (granting motion to dismiss under § 52-577c(b)'s statute of limitations where plaintiff did not try to determine the source of the contamination, but should have in the exercise of reasonable care); *Blackburn v. Miller-Stephenson Chem. Co.*, 1998 Conn. Super. LEXIS 2621, at *11-12 (Conn. Super. Ct. Sept. 11, 1998) (where plaintiff was familiar with the history of the property, including its uses for manufacturing, yet refused to get a phase I site assessment done in 1991 after obtaining title,

---

[24]     The discovery rule in New Jersey is similar to the statute of limitations provided in General Statutes § 52-577c(b).  Under New Jersey's discovery rule, "a cause of action does not accrue until a plaintiff learns, or reasonably should learn, the existence of that *state of facts* which may equate in law with a cause of action."  *New West Urban Renewal*, 230 F. Supp. 2d at 572 (internal quotation marks, citation, and brackets omitted) (italics in original).

[25]     In any event, as explained above, actionable harm occurs when the plaintiff knows of the <u>contamination</u>, not the specific source of the contamination.  *Supra* at p. 40; *OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 521-22 (D. Conn. 2007).

and benzene was detected on the property in 1992, the statute of limitations under § 52-577c

began to run in 1991 because plaintiff "did not act reasonably in 1991").

Further, even though a party need not know the specific identity of a tortfeasor for the

statute of limitations to begin,[26] Plaintiff's executives testified that they were well aware of

Monsanto and even did business with the company long before 2008.  Ex. B, Kellogg 9/30/13

Dep. Tr. at 62-63; Ex. C, Hart 10/2/13 Dep. Tr. at 33, 120-21.  Plaintiff alleges that Monsanto

was "the exclusive manufacturer of PCBs in the United States" before PCBs were banned in

1977.  Am. Compl. at ¶¶15, 20.  Although Plaintiff's executives testified (conveniently so) that

they did not know Monsanto manufactured PCBs before 2008, Plaintiff's Director of

Administration and former Environmental Compliance Manager testified as a 30(b)(6) witness

that she could have found that out with reasonable due diligence such as searching the Internet.[27]

Moreover, Plaintiff was advised in 1982, and again in 1993, of findings of "Aroclor

1254," a specific type of PCB that was actually a <u>trademark</u> of Monsanto, as Plaintiff itself states

in the Amended Complaint, information that Plaintiff reasonably could have and should have

---

[26]     *See Cadlerock Props. Joint Venture v. Schilberg*, 2001 Conn. Super. LEXIS 1973, at *8-
9 (Conn. Super. Ct. July 17, 2001) (holding that under § 52-577c(b), the statute of limitations
runs from the date plaintiff was aware of the contamination on the property, not the date the
alleged "perpetrator of pollution" is discovered); *see also BellSouth Telecomms. v. W.R. Grace &
Co.*, 77 F.3d 603, 611 (2d Cir. 1996) (for claim for asbestos abatement, affirming grant of
summary judgment on statute of limitations grounds and finding that "there is no dispute that
Bellsouth knew, or should have known, that any asbestos contamination was attributable to
Grace Monokote fireproofing[,]" which was installed in 1971).

[27]     On October 2, 2013, Ms. Hart testified as follows:
         Q. Okay. Do you believe you would have been able to contact your – through the
         various industry contacts that you have, to determine, prior to the lawyers telling
         you in this case, that Monsanto was the manufacturer of PCBs in the United
         States?
         A. Could I have obtained that information?
         Q. Yes.
         A. **I could have obtained it off the Internet or something, yeah.**
Ex. 3, Hart 10/2/13 Dep. Tr. at 209 (emphasis added).

known after being on notice of these findings.  Am. Compl. at ¶16 ("Many commercial PCB mixtures are known in the United States by the trade name Aroclor, which was trademarked by Old Monsanto.").  Thus, after being informed that it had Aroclor 1254 on its Property in 1982, Plaintiff reasonably should have known that the PCBs might have come from Monsanto.

c.   Summary Judgment Should Also Be Granted Because Plaintiff
     Took Some Investigatory Measures Previously

As yet a third basis for dismissal, summary judgment is appropriate because Plaintiff took some investigatory measures previously, but did not seek to recover its costs.  Under such circumstances, summary judgment should also be granted.  *See BellSouth Telecomms. v. W.R. Grace & Co.*, 77 F.3d 603, 613 (2d Cir. 1996) (affirming grant of motion for summary judgment on statute of limitations grounds because the "evidence unambiguously demonstrates that, by 1987, Bellsouth's senior managers knew both that abatement was necessary (partial abatement, immediately; and total abatement, eventually), and that BellSouth had a cause of action against the manufacturer of the fireproofing for the abatement costs[,]" and BellSouth took abatement measures in 1987-1990, but did not seek to recover its costs).

*Calabrese v. McHugh*, 170 F.  Supp. 2d 243 (D. Conn. 2001), is instructive.  In that case, the court dismissed plaintiff's tort claims based on environmental contamination on statute of limitations grounds because "plaintiff had actual knowledge of the existence of environmental contamination" on the property in 1989, the same year an environmental consultant "recommended to plaintiff that further testing and investigation of the site be performed."  *Id.* at 258.  From 1989 forward, the property was the subject of ongoing investigation and remediation efforts by the DEP and EPA; "Plaintiff engaged in some initial cleanup efforts, removing the twelve capacitors [that had leaked PCBs into the soil], but thereafter he did nothing further towards the cleanup."  *Id.*  The court noted, "[t]here is nothing in the record that would indicate

44

that, prior to 1998, all contamination had been abated, that plaintiff had no further obligation to remediate the hazardous waste . . . ." *Id.* at 259.

The court rejected plaintiff's argument that the statute of limitations did not start to run until plaintiff learned of the DEP's Phase I Assessment of the Site in 1998 "and the additional cleanup efforts and costs associated therewith." The court explained that "an injury is first sustained when a party suffers some form of actionable harm. The harm need not have reached its fullest manifestation before the statute begins to run." Importantly, the court held that plaintiff "cannot persuasively argue that his tort claims for remediation costs did not accrue because his first injury was dwarfed by the ultimate loss." *Id.* at 260 (emphasis added).

In this case, Plaintiff made the choice to look the other way for decades, until the regulatory authorities forced it to incur costs to clean up its PCB contamination. Indeed, Plaintiff's chief environmental executive testified that he was not concerned with the findings in the Weston and HRP reports because he "had other fish to fry." *See* Ex. N, Paul 10/10/13 Dep. Tr. at 196-97. Only after it was caught by the EPA/DEP did Plaintiff assert its belated and unsalvageable claims against Defendants. This is a classic case of why the statute of limitations is important and needed: "to protect defendants against stale or unduly delayed claims." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1420 (2012) (internal quotations and citation omitted); *see also Florida Power & Light Co. v. Allis Chalmers Corp.*, 85 F.3d 1514, 1519 (11th Cir. 1996) ("Once the appropriate statute of limitations period has passed, manufacturers, like individuals, have the right to conduct their affairs without fear of liability for their [past] actions.") (internal quotation marks and citation omitted). Plaintiff's CPLA claim is barred by the two year statute of limitations.

**2.      Plaintiff's CPLA Claim Is Barred by the Statute of Repose**

If the Court reaches this argument, judgment should be granted on the pleadings as to Plaintiff's CPLA claim because it is barred by the statute of repose.  The CPLA's statute of repose provides that no product liability claim may be brought "later than ten years from the date that the party last parted with possession or control of the product."  General Statutes § 52-577a(a).  It is undisputed that PCBs left Old Monsanto's possession and control in the 1950-1960 timeframe, and certainly before the manufacture of PCBs was banned in 1977, more than 10 years before Plaintiff brought its original complaint dated June 17, 2010.   *See* Am. Compl. at ¶¶20, 44; Doc. 42 at 5-6.   For the reasons set forth in Defendants' Motion to Dismiss the Amended Complaint (which are incorporated herein), Plaintiff has failed to plausibly allege an exception to the statute of repose and therefore judgment on the pleadings pursuant to Rule 12(c) should be granted. *See* Doc. 42 at 6-13.

Moreover, concluding that the statute of repose does not bar Plaintiff's CPLA claim infringes on Defendants' due process rights.  Statutes of repose create rights – a right not to be sued for a particular claim after a certain amount of time.  *First United Methodist Church of Hyattsville v. U.S. Gypsum Co*., 882 F.2d 862, 866 (4th Cir. 1989), *cert. denied*, 493 U.S. 1070 (1990) ("A statute of repose creates a substantive right in those protected to be free from liability after a legislatively-determined period of time.").  Acts of Congress and state laws usually apply only prospectively, unless there is a clear legislative intent to the contrary.  *Greene v. United States*, 376 U.S. 149, 160 (1964).  The U.S. Supreme Court has explained that the presumption against retroactivity applies to antecedent rights, where retroactive application "would infringe upon or deprive a person of a right that had matured or become unconditional."  *Bennett v. New Jersey,* 470 U.S. 632, 639-40 (1985).  "[S]tatutes affecting substantive rights and liabilities are presumed to have only prospective effect." *Id.*

46

If the Federally Required Commencement Date ("FRCD") under CERCLA were to apply here and "preempt" the statute of repose, it would in effect be taking away a right that Defendants already had.  *See In re: Lejeune v. United States*, 2011 U.S. Dist. LEXIS 155687, at *29-30 (N.D. Ga. Sept. 29, 2011) (indicating that applying the FRCD to a statute of repose raises due process concerns).  Defendants' right not to be sued for these claims per the statute of repose existed before CERCLA was passed in 1980 and well before section 9658 was passed in 1986.  Applying the FRCD would "revive" a cause of action that is substantively extinct (as opposed to only being procedurally barred by a statute of limitations).  Accordingly, extinguishing the repose period of Defendants would violate their due process rights.

Finally, for the reasons set forth in their Reply (Doc. 51), the statute of repose is not preempted by section 9658 of CERCLA.  Doc. 51 at 1-6.  Accordingly, Plaintiff's CPLA claim is barred by the statute of repose.  *See* Doc. 42 at 5-13.  However, the Court need not decide the statute of repose arguments if it finds that Plaintiff's CPLA claim is barred by the statute of limitations, as explained above.

### C.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CUTPA CLAIM

#### 1.     Plaintiff's CUTPA Claim Is Precluded Because Its Exclusive Remedy for Its Product-Related Property Damage Claims Is Under the CPLA

As set forth in Defendants' Motion to Dismiss the Amended Complaint, Plaintiff's CUTPA claim is precluded because the CPLA is its exclusive remedy for its alleged property damages from the allegedly defective PCBs.  *See* Doc. 42 at 13-14; *see also* 6/12/2013 Tr. at 26 (Court dismissing Plaintiff's CUTPA claim and explaining, "what you're alleging is compensable under the product liability statute, and on that basis, I grant the motion to dismiss that count."), 28 (Court stating that it did not expect to see this claim in the Amended Complaint).

### 2. Plaintiff's CUTPA Claim Is Barred by the Statute of Limitations

Alternatively, Plaintiff's CUTPA claim is also barred by the three-year statute of limitations provided in General Statutes § 42-110g(f).  The statute of limitations begins to run from the date of the violation rather than from the date of discovery.  *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212-13 (1988).   The statute of limitations under CUTPA "precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred."  *Id.* at 212.

Plaintiff alleges that "Defendants engaged in unfair and deceptive trade practices in designing, manufacturing, distributing, marketing and/or selling the PCB Products to Hubbard-Hall when Defendants knew that the PCB Products were defective and unreasonably dangerous."  Am. Compl. at p. 25, ¶136.  The paint was made and sold to Plaintiff more than three years before the lawsuit was brought, as Plaintiff used the PCB-containing paint in or around 1954, PCBs were added to paint "in the 1950-1960" timeframe, and the manufacture of PCBs was banned in 1977.  *Id.* at ¶¶ 20, 41, 44, 135; Ex. 3 at 3; *supra* at p. 5.   Accordingly, Plaintiff's CUTPA claim is precluded by the statute of limitations.  General Statutes § 42-110g(f).

### D. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S REQUEST FOR DECLARATORY RELIEF

As explained in Defendants' Motion to Dismiss, Plaintiff's request for declaratory relief is not an independent cause of action.  Doc. 42 at 14-15.  Plaintiff does not dispute that this claim cannot stand on its own.  *See* 6/12/2013 Tr. at 26-27 (Court explaining, "With regard to the declaratory judgment count, we're all in agreement . . . the act doesn't provide what might be thought of as a substantive claim, so unless you have a claim for relief under applicable law, state or federal, that count would go out. . . .").  Because Defendants are entitled to summary

judgment, and/or a judgment on the pleadings, on the CPLA and CUTPA claims, Plaintiff's claim for declaratory relief also fails.

## IV.     CONCLUSION

As set forth in Defendants' Motion to Dismiss the Amended Complaint, Plaintiff's CPLA claim is barred by the 10-year statute of repose, which is not preempted by 42 U.S.C. § 9658. Regardless of whether the statute of repose is preempted by § 9658, Plaintiff's CPLA claim is barred by the statute of limitations.  Plaintiff's CUTPA claim is precluded because Plaintiff's exclusive remedy for its alleged damages is the CPLA, and the CUTPA claim is also barred by the applicable statute of limitations.  Plaintiff's request for declaratory relief cannot stand on its own and must be dismissed accordingly.  For the reasons set forth above, Defendants are entitled to summary judgment and/or a judgment on the pleadings.

Respectfully submitted,

**DEFENDANTS,**
**MONSANTO COMPANY, PHARMACIA**
**CORPORATION, PFIZER INC., AND**
**SOLUTIA INC.**

_____/s/ Jeffrey J. White_____
Stephen E. Goldman (ct06224)
E-mail: sgoldman@rc.com
Jeffrey J. White (ct25781)
E-mail: jwhite@rc.com
Sorell E. Negro (ct29195)
E-mail: snegro@rc.com
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597
Telephone:  (860) 275-8237
Facsimile:   (860) 275-8299

## CERTIFICATION

This is to certify that on the 7th of February 2014, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF system.


        /s/ Jeffrey J. White
        Jeffrey J. White