UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                                :
HUBBARD-HALL, INC.,             :
                                :
     Plaintiff,                 :
                                :
v.                              :    No. 3:13-cv-104(RNC)
                                :
MONSANTO COMPANY, et al.,       :
                                :
     Defendants.                :
                                :
```

RULING AND ORDER

This case arises from contamination of industrial property caused by polychlorinated biphenyls ("PCBs"), a highly toxic substance.  Plaintiff Hubbard-Hall, a chemical distributor, alleges that PCB-containing paint applied to the exterior of a structure on its property, the Tank Farm Building, has migrated into building materials and surrounding soil.  "Old Monsanto," a predecessor of the named defendants, was the sole manufacturer of PCBs in the United States before their manufacture was banned by the EPA in 1977.  The Environmental Protection Agency and the Connecticut Department of Environmental Protection have directed plaintiff to remediate the contamination.  Plaintiff seeks compensatory damages and declaratory relief.  Count one of the amended complaint alleges a violation of the Connecticut Products Liability Act (CPLA), Conn. Gen. Stat. §§ 52-572m et seq.  Count two alleges a violation of the Connecticut Unfair Trade Practices

Act (CUTPA), §§ 42-110b et seq.[1]

Defendants have filed two dispositive motions.  The first, a motion for judgment on the pleadings, argues that the CPLA claim is barred by Connecticut's ten-year statute of repose because plaintiff's harm occurred in the mid-1950s.  It also argues that the CUTPA claim is precluded by the exclusive remedy provision of the CPLA.  Defendants' second motion seeks summary judgment on the CPLA claim based on Connecticut's two-year statute of limitations.  Defendants argue that Hubbard-Hall received notice of PCB contamination on its property as early as 1982, and certainly more than two years before it filed this lawsuit.

This ruling addresses both motions.  For the reasons stated below, the motion for judgment on the pleadings is granted as to the CUTPA claim but denied as to the CPLA claim, and the motion for summary judgment is granted.

I.

The CPLA's statute of repose bars a claim brought "later than ten years from the date that the party last parted with possession or control of the product."  Conn. Gen. Stat. § 52-577a(a).  Statutes of repose are not subject to equitable tolling, and apply even if the actionable harm underlying the claim has yet to be discovered.  See <u>Saperstein v. Danbury Hosp.</u>,

---

[1] Count three, for declaratory relief, is dependent on the two substantive counts.

X06CV075007185S, 2010 WL 760402, at *13 (Conn. Super. Ct. Jan. 27, 2010) ("[T]he law is well established that equitable tolling does not apply to statutes of repose."). The parties agree that it has been more than fifty years since PCB-containing paint was used on the plaintiff's property, and more than thirty-five years since the manufacture of PCBs was banned. The only dispute is whether an exception to the statute of repose has been sufficiently pleaded in the amended complaint.

The CPLA delineates three exceptions to the statute of repose, allowing suits to be brought after the ten-year period has expired. Relevant here are the "useful safe life" and "fraudulent concealment" exceptions. Conn. Gen. Stat. §§ 52-577a(c), (d). The Court concludes that Hubbard-Hall has adequately pleaded the useful safe life exception, but not the fraudulent concealment exception.

Section 52-577a(c) provides that the statute of repose shall not apply "provided the claimant can prove that the harm occurred during the useful safe life of the product." The duration of a product's useful safe life is a question of fact. The statute itself lists several non-exclusive factors that may be considered in determining whether the useful safe life of a product has expired:

    (1)   The effect on the product of wear and tear or
           deterioration from natural causes;
    (2)   the effect of climatic and other local conditions in
           which the product was used;

(3)  the policy of the user and similar users as to repairs,
     renewals and replacements;
(4)  representations, instructions and warnings made by the
     product seller about the useful safe life of the product;
     and
(5)  any modification or alteration of the product by a user
     or third party.

Id. § 52-577a(c).  Read together, these factors indicate that a

product's "useful safe life" is determined by reference to

reasonable expectations about how long the product may be safely

used before it needs repair or replacement.

Plaintiff alleges that PCBs "have an effectively infinite

useful safe life" and that PCB-containing paint, which was

manufactured to be extremely durable, has a useful safe life "at

least in excess of 50 years." Id. at ¶¶ 18, 58.  It further

alleges that "one of the reasons that PCB-containing paint has

not been a focus of EPA . . . is that contamination from the PCB-

containing paint typically will not be detected until the paint .

. . begin[s] to peel or flake and contaminate the surrounding

environment." Id. ¶ 58.  Defendants take the position that the

"useful safe life" exception can never apply to products like

PCBs and PCB-containing paint because they are inherently

dangerous from the start.

No Connecticut Supreme Court cases construe the phrase

"useful safe life," but the Connecticut Appellate Court has used

the phrase interchangeably with "normal life expectancy." Moran

v. E. Equip. Sales, Inc., 818 A.2d 848, 852 (Conn. App. 2003)

4

(affirming jury verdict that design of wheel loader was unreasonably dangerous *and* that harm occurred during the product's "useful safe life").  Similarly, a Connecticut trial court has ruled that the exception applies if the product was still "in a condition to accomplish its intended purpose" when the harm occurred.  Terry v. Palace Aids, Inc., CV990078989S, 2000 WL 1521347, at *3 (Conn. Super. Ct. Sept. 22, 2000) (denying summary judgment when material issue of fact remained about the useful safe life of a defective wood stove and stove duct piping).  These cases are consistent with the Model Uniform Products Liability Act, which provides that the "useful safe life" of a product "begins at the time of delivery of the product and extends for the time during which the product would normally be likely to perform or be stored in a safe manner."  Model Uniform Products Liability Act § 110(A) (1979) (emphasis added). Under the Model Act, the useful safe life of a product expires when the product is no longer "likely" to be safe for "normal" use.

In this case, the alleged harm is the contamination of the plaintiff's property due to the migration of PCBs from paint into building materials and soil.  See ECF No. [38] ¶ 151.  In assessing whether Hubbard-Hall has plausibly alleged that this harm occurred during the "useful safe life" of the product, it is necessary to distinguish between contamination of the Tank Farm

5

Building and contamination of the surrounding soil.  With respect
to the first form of harm, plaintiff has adequately pleaded the
elements of the exception.  With respect to the second, however,
it has not.

Dealing with the soil contamination first, the facts alleged
in the amended complaint do not support a reasonable inference
that the contamination occurred during the useful safe life of
the product, whether the product is PCB-containing paint or
PCBs.[2]  Plaintiff states that PCB-containing paint is "nearing
the end of its useful safe life" when it "begin[s] to peel or
flake and contaminate the surrounding environment."  See ECF No.
[38] ¶ 58.  It follows, then, that peeling and flaking of PCB-
containing paint is a precondition to contamination of
surrounding soil.  Could a jury reasonably conclude that PCB-
containing paint applied to the Tank Farm Building was still
within its useful safe life when, as a result of peeling and
flaking, PCBs were released into the soil?  Given the meaning of
"useful safe life," the answer must be no.

The "useful safe life" of a product expires when it can no
longer be reasonably expected to function as intended.  As with
products that "wear out" and become unsafe or ineffective over
time, the "useful safe life" of PCBs and PCB-containing products

_____

[2] The amended complaint does not clearly allege which product is
the focus of its CPLA claim.

expires when a reasonable consumer would repair or replace the product.  See Conn. Gen. Stat. § 52-577a(c)(1)-(5).  Once PCB-containing paint begins to peel and flake, it is no longer serving its expected "useful" function of covering or sealing a surface, regardless of whether it is still or ever was "safe."  See Conn. Gen. Stat. § 52-577a(c)(3).  Thus, claims of harm occurring as a result of the peeling and flaking of the product, as alleged here with regard to soil contamination, are outside the scope of the "useful safe life" exception.

The analysis is slightly different if the accused product is the PCBs themselves.  Plaintiff urges that PCBs have an "infinite" useful safe, even when used in a non-enclosed manner as here.  ECF No. [38] ¶ 18.  But for purposes of the exception to the statute of repose, the "useful safe life" of PCBs expired when the product was no longer "likely" to be safe for "normal" use.  See Model Uniform Products Liability Act § 110(A).  Under this standard, no reasonable jury could find that the "useful safe life" of the PCBs in the paint on the exterior of the Tank Farm Building extended beyond 1977 when the use of PCBs in other than "totally enclosed" systems was banned.  ECF No. [38] ¶ 20.  While this interpretation does not directly address all five of the § 52-577a(c) factors, it is effectively dictated by factor three, "the policy of the user and similar users as to repairs, renewals and replacements."  The useful safe life of the PCBs

expired when safety concerns dictated the need to "repair" or
"replace" (i.e., remediate) PCBs in other than totally enclosed
systems.

Assuming the useful safe life of PCBs expired no later than
1977, the issue is whether the harm – here, the contamination -
occurred while the paint was intact and prior to 1977.  The
amended complaint does not allege when the soil on Hubbard-Hall's
property became contaminated.[3]  Instead, plaintiff appears to
rely on its assertion that PCBs have an "infinite" useful safe
life.  In the absence of factual allegations that, if proven,
would allow a jury to conclude that the contamination of the Tank
Farm Building and surrounding area occurred (1) when the paint
was intact, and (2) prior to 1977, the "useful safe life"
exception is inapplicable to the contamination of the soil.

This "useful safe life" analysis leads to a different
conclusion when applied to the other form of harm Hubbard-Hall
has alleged: contamination of the Tank Farm Building itself.
Peeling or flaking is not a precondition to this type of
contamination.  Plaintiff alleges that PCBs were applied to (and
then migrated into) the structure's cinder block walls, and it
stands to reason this occurred while the paint was still

---

[3]
    In its moving papers, without citation to the complaint, the
plaintiff states that the contamination "occurred sometime in the
50-plus years since [the Tank Farm] [B]uilding's construction."
ECF No. [50] at 21.

performing its intended function of covering or sealing the Tank Farm Building's exterior surface.

The critical inquiry is whether the complaint plausibly alleges that the migration of the PCBs into the cinder block walls occurred prior to the 1977 restrictions on PCB use. If so, the harm occurred while the PCB-containing paint was still serving its purpose and prior to the EPA's declaration that PCBs are unsafe for use outside totally enclosed systems – that is, during the product's useful safe life. If the harm occurred after 1977, the useful safe life exception does not apply for the reasons discussed above.

A fair reading of the complaint suggests that the Tank Farm Building was contaminated prior to 1977. The complaint states that the structure was "constructed in 1954 and partially re-built in 1955." Am. Comp. ¶ 85, ECF No. [38]. It is reasonable to infer that the building was painted at that time, which pre-dated the PCB ban by some two decades. And it appears that contamination of the Tank Farm Building occurred even as the structure was being painted: in painting the building, Hubbard-Hall was covering the outer walls with a highly toxic substance. The structure's contamination therefore occurred during the product's useful safe life if the product had *any* useful safe life. As discussed above, it did. Because Hubbard-Hall has pleaded that the Tank Farm Building was contaminated while the

PCB-containing paint remained intact and before the use of PCBs was restricted in 1977, this form of harm falls within the useful safe life exception to the statute of repose.[4]

II.

The "fraudulent concealment" exception to the statute of repose is codified at Conn. Gen. Stat. § 52-577a(d).  It provides that the statute of repose does not bar "any action against a product seller who intentionally misrepresents a product or fraudulently conceals information about it, provided the misrepresentation or fraudulent concealment was the proximate cause of harm to the claimant."  Hubbard-Hall asserts that its claim can proceed because over the course of several decades, Old Monsanto fraudulently concealed information about the dangers of PCBs.

No Connecticut case has been cited interpreting the relevant statutory language, and the parties do not agree on its meaning. Defendants argue that § 52-577a(d) must be construed in light of

---

[4]As the complaint discusses, the harm to the Tank Farm Building involves not just the outer covering of PCB-containing paint, but PCBs that have migrated a short distance into the cinder blocks. The complaint does not suggest how quickly this migration might have occurred.  It is possible, then, that Hubbard-Hall incurred some portion of its building-related harm after 1977, as PCBs gradually penetrated the Tank Farm Building's walls to a greater depth.  But whatever effect this intensely factual question might have on Hubbard-Hall's claim, it does not prevent Hubbard-Hall from invoking the useful safe life exception at the pleadings stage.  It is enough that some portion of the harm to the Tank Farm Building – an apparently significant portion — occurred in the mid-1950s.

Conn. Gen. Stat. § 52-595, which provides for delayed accrual of
a cause of action if "any person, liable to an action by another,
fraudulently conceals from him the existence of the cause of such
action."  Section 52-595, unlike § 52-577a(d), has been
interpreted by the Connecticut courts, and it requires three
elements: 1) defendant's actual awareness, not imputed knowledge,
of the facts necessary to establish plaintiff's cause or action;
and 2) defendant's intentional concealment of these facts from
plaintiff; 3) for the purpose of delaying plaintiff's lawsuit.
Falls Church v. Tyler, Cooper & Alcorn, LLP, 912 A.2d 1019,
1032-33 (Conn. 2007).  Defendants argue that this standard
transfers wholesale to statute-of-repose cases under § 52-
577a(d).  They bolster their contention by reference to two
decisions interpreting the fraudulent concealment exception to
Illinois's products liability statute of repose, each of which
announces a Falls Church-like standard.  See, e.g., Landry v.
Keene Corp., 811 F. Supp. 367, 372 (N.D. Ill. 1993).  Hubbard-
Hall, for its part, does not articulate its view of the
appropriate standard, but does assert that defendants' is too
stringent.

Hubbard-Hall is correct.  Differences on the faces of the
statutes preclude seamless application of the § 52-595 standard
in § 52-577a(d) cases.  Section 52-595, entitled "Fraudulent
Concealment of Cause of Action," delays accrual of a cause of

action if the defendant "fraudulently conceals from [the plaintiff] *the existence of the cause of such action*."  Conn. Gen. Stat. § 52-595 (emphasis added).  Section 52-577a(d), on the other hand, permits an otherwise barred action if the defendant "intentionally misrepresents *a product* or fraudulently conceals *information about it*."  Conn. Gen. Stat. § 52-577a(d) (emphasis added).  Section 52-577a(d) speaks to concealment concerning the product in issue, not the cause of action.  The <u>Falls Church</u> standard, which reflects the very different statutory language of § 52-595, is therefore a poor fit.[5]  Applying it in § 52-577a(d) cases would impose requirements (chiefly, the need for a plaintiff to show that a defendant acted for the purpose of delaying suit) out of keeping with the statute's text.[6]

---

[5] The Illinois cases discussed by defendants are inapposite for the same reason.  The rule they interpret, Ill. Code Civ. P. § 13-215, tolls the statute of repose if "a person liable to an action fraudulently conceals the cause of such action."

[6] It might reasonably be argued that the phrase "fraudulent concealment," taken alone, is sufficiently imbued with common law meaning to fairly imply the elements urged by defendants. Fraudulent concealment was a common law doctrine before it was codified in any statute, and its usual common law meaning both concerned concealment of a cause of action and required that the defendant intend to delay a lawsuit.  See Note, 43 HARV. L. REV. 471, 472-73 (1930).  This argument would be persuasive if the phrase appeared without qualification or elaboration in § 52-577a(d) – if the statute simply read, for example, "An act of fraudulent concealment shall toll the statute of repose."  But the legislature has specified the relevant object of concealment, and it is "a product" or "information about it."  In these circumstances, the Court has no warrant to write in an additional object of concealment (a cause of action) and its attendant mental state (intent to delay suit).

But that does not mean § 52-595 is irrelevant.  Despite the statutes' differences, each employs identical language – "fraudulently conceals" – to describe the conduct and mental state a plaintiff must allege to bring an otherwise time-barred action.  To that extent, the Connecticut courts' construction of § 52-595 should inform this Court's construction of § 52-577a(d). So too should Connecticut's common law of fraud.  <u>Standard Oil Co. of N.J. v. United States</u>, 221 U.S. 1, 59, 31 S. Ct. 502, 55 L.Ed. 619 (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to be used in that sense."); <u>Hunte v. Blumenthal</u>, 680 A.2d 1231, 1234 (Conn. 1996) ("It is assumed that all legislation is interpreted in light of the common law at the time of its enactment."); <u>see also Neder v. United States</u>, 527 U.S. 1, 22, 119 S. Ct. 1827, 144 L.Ed.2d 35 (1999) ("[A]ctionable 'fraud' had a well-settled meaning at common law.").

 In this context, it is reasonable to conclude that Hubbard-Hall must allege three elements to make out the fraudulent concealment exception: (1) that defendants had actual awareness, rather than imputed knowledge, of material information about the product;[7] (2) that they intentionally concealed this information,

---

[7] Information about a product is "material" if it is likely to affect the decisions or conduct of its users.  <u>Miller v. Guimaraes</u>, 829 A.2d 422, 434 (Conn. App. 2003).

13

either through intentional misstatement, affirmative act of concealment, or failure to disclose when under a duty to do so;[8] and 3) that plaintiff's reliance on the misstatement or omission proximately caused its harm.  See Hamilton v. Smith, 773 F.2d 461, 468 (2d Cir. 1985) ("To establish fraudulent concealment under [§ 52-595], a plaintiff must show that . . . absent a fiduciary relationship, the defendant was guilty of some affirmative act of concealment."); Falls Church, 912 A.2d at 1032–33 (describing the elements of fraudulent concealment under § 52-595); Ferris v. Faford, 890 A.2d 602, 611 (Conn. App. 2006) (identifying the "well settled" elements of common-law fraud); Spilke v. Spilke, No. FA000440636S, 2007 WL 2245936, at *8 (Conn. Super. July 18, 2007) (a misrepresentation of fact is not fraudulent if it is not material).  This standard appropriately accounts for the plain language of § 52-577a(d), the case law on § 52-595 and settled understandings concerning the law of fraud.

There remains one final question regarding the standard to be applied to Hubbard-Hall's amended complaint.  Defendants argue that Hubbard-Hall's invocation of the fraudulent concealment exception is a "claim[] of fraud" that must be evaluated under the heightened pleading standard of Federal Rule of Civil

---

[8] Such a duty might arise due to the existence of a fiduciary relationship between seller and buyer, see Falls Church, 912 A.2d at 1034, or a seller's partial or incomplete statements relating to the concealed information, Wedig v. Brinster, 469 A.2d 783, 788 n.4 (Conn. App. 1983).

14

Procedure 9(b).  ECF No. 42-1, at 13.  Defendants are correct: under Rule 9(b), "[a] claim of fraudulent concealment must be pled with particularity."  <u>Hinds Cnty., Miss. v. Wachovia Bank N.A.</u>, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009); 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1297 (3d ed. 2014) ("[C]ases involving claims of fraudulent concealment . . . are held to fall within the heightened pleading requirement of Rule 9(b).").  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud" – the "who, what, when, where, and how."  Fed. R. Civ. P. 9(b); <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir. 1990).  A plaintiff alleging a fraudulent misstatement must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 290 (2d Cir. 2006).  If a plaintiff alleges fraud by omission and so cannot "specify the time and place because no act occurred," the complaint must still allege "(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what defendant obtained through the fraud."  <u>Estate of Axelrod v. Flannery</u>, 476 F. Supp. 2d 188, 192 (D. Conn. 2007) (internal quotation marks omitted).

15

Analyzed under the substantive standard of § 52-577a(d) with the procedural overlay of Rule 9(b), Hubbard-Hall's claim of fraudulent concealment fails.  Plaintiff has not alleged facts showing that Old Monsanto was aware of material information concerning the dangers of PCBs at the pertinent time.  And even if Old Monsanto was aware of such information, Hubbard-Hall has failed to properly identify a harm-causing misstatement, act of concealment or omission by Old Monsanto.

Hubbard-Hall alleges that beginning in the 1930s and continuing through the 1970s, Old Monsanto became increasingly aware that PCBs could harm humans, animals and the environment. Hubbard-Hall states that in the 1930s and 1940s, Old Monsanto learned of reports "indicat[ing] that prolonged and excessive occupational exposure to PCBs might cause liver defects in humans."  Am. Comp. ¶ 30, ECF No. [38].  An Old Monsanto memorandum from September 1955 stated, "We know Aroclors [PCBs] are toxic but the actual limit has not been precisely defined." Id. at ¶ 31.  In 1968, Old Monsanto learned that people in Japan had become ill from ingesting PCB-contaminated rice, and in 1969 an internal report acknowledged that some PCBs were "nearly global environmental contaminants."  Id. at ¶¶ 33-37.  During the 1970s, Old Monsanto's knowledge of the dangers posed by PCBs increased.  In 1974, the EPA sent it a report stating, "A tremendous quantity of research has demonstrated that

16

environmental exposure to [PCBs] causes serious impairment of the functions of the liver."   Id. at ¶¶ 38–40.

Accepting Hubbard-Hall's statements as true, Old Monsanto unquestionably was aware of material information about the dangers of PCBs by the mid-1970s (at the latest).  And an industrial user of PCB-containing paint like Hubbard-Hall might well have ceased using the product had it known that PCBs were "nearly global environmental contaminants" that could seriously harm humans and animals through environmental exposure.  But Hubbard-Hall's complaint does not allege that it used PCB-containing paint during the 1970s.  It states that the Tank Farm Building was "constructed in 1954 and partially re-built in 1955."  Id. at ¶ 85.  This implies that Hubbard-Hall's use of PCB-containing paint occurred no later than the mid-1950s. Hubbard-Hall has suggested it might have used the paint later than that, and indeed it might have.  ECF No. 35 ("[T]he building itself was constructed in or around 1954 . . . . So presumably it's somewhere at that time or after.").  But it would be speculative to conclude on the basis of Hubbard-Hall's complaint that the paint was used any later than the mid-1950s.  Thus, the question is whether at that time, Old Monsanto was aware of material information concerning the risks of PCB-containing paint – that is, information that might have affected the decisions or conduct of industrial users like Hubbard-Hall.

17

Based on the parties' submissions, Old Monsanto lacked knowledge of material risks associated with PCB-containing paint in the mid-1950s.  As defendants point out, Old Monsanto knew only that 1) some reports indicated that "prolonged and excessive occupational exposure to PCBs might cause liver effects in humans," and 2) PCBs were toxic at some limit (but this limit was unknown).  Hubbard-Hall does not explain why this information would have affected its decision to apply PCB-containing paint to the Tank Farm Building.  The paint posed no danger to Hubbard-Hall's interests unless the PCBs it contained might migrate and persist in sufficiently high concentrations to create environmental or health risks.  Nothing in Old Monsanto's limited body of knowledge suggested this was likely or even possible.  To be sure, Old Monsanto was aware of information indicating that PCBs posed dangers in certain respects, and this information would have been of great interest to some parties – for instance, Old Monsanto employees who were routinely exposed to PCBs in their day-to-day work.  But plaintiff has failed to articulate why Old Monsanto's information would have been of interest to an entity like Hubbard-Hall.

To satisfy the second element of § 52-577a(d), Hubbard-Hall must identify a misrepresentation or act of concealment on the part of Old Monsanto.  This might take the form of an intentional misstatement, an affirmative act of concealment, or a failure to

disclose information (if Old Monsanto was under a duty to disclose).  Hubbard-Hall has not alleged facts suggesting that Old Monsanto was duty-bound to disclose information relating to the risks posed by PCBs.[9]  Nor has it alleged that Old Monsanto took affirmative steps to conceal information about PCBs; it merely alleges that Old Monsanto was silent.  Thus, Hubbard-Hall may satisfy this element only if it alleges that Old Monsanto made intentional misstatements about the dangers of PCBs, and those misstatements proximately caused its harm.

Hubbard-Hall has failed to adequately identify any such intentional misstatements.  The only statements Hubbard-Hall identifies were made by defendants in litigation documents within the last decade.  See Am. Comp., ¶¶ 76–78, ECF No. [38].  Even if these qualify as intentional misstatements, they cannot have proximately caused plaintiff's harm – Hubbard-Hall obviously did not rely on them when it decided to paint the Tank Farm Building in 1954.[10]

Plaintiff's complaint identifies no other statements made by

---

[9] For this reason, its argument that Old Monsanto failed to adequately warn of the risks associated with PCBs is unavailing.

[10] It might reasonably be argued that Hubbard-Hall can make out reliance and proximate causation by alleging misstatements that occurred after it used PCB-containing paint, but during the life of the ten-year statute of repose.  Such statements could not have caused Hubbard-Hall to use the product, but could have caused it to forgo filing a timely complaint.  The statements Hubbard-Hall identifies, though, were made well outside the ten-year statute of repose.

Old Monsanto.  The closest calls appear in paragraphs 45 – "Old Monsanto specifically marketed its PCBs for use in paints and other coatings, touting their value as additives that increased the flexibility, improved the adhesion and extended the life of paints" – and 157 – "Defendants expressly warranted that the PCB Products were safe for their intended use."  Plaintiff states that it "elected to use PCB-containing paint on its Property as a result of [such] marketing efforts" and "reasonably relied" on Old Monsanto's express warranty.  Am. Comp. ¶ 56, 158.

These allegations fail under Rule 9(b).  Though Hubbard-Hall has roughly summarized the content of Old Monsanto's purported statements, it has not "specif[ied] the statements" themselves. Lerner, 459 F.3d at 290.  Nor has it "state[d] where and when the statements were made."  Id.  Hubbard-Hall has described the alleged misstatements only in the most general terms – which is precisely what Rule 9(b) does not permit.

Hubbard-Hall comes close to conceding as much in its response to defendants' motion.  After reciting the allegations discussed above, it states: "Reading these allegations in favor of Hubbard-Hall, and making reasonable inferences based on defendants' recent statements in court filings that PCBs are safe, Hubbard-Hall has alleged facts that plausibly show that its CPLA claim fits within the intentional misrepresentation and fraudulent concealment exception to the statute of repose."  ECF

20

No. 50, at 18.  Hubbard-Hall in effect asks the Court to infer from defendants' specifically identified (but recent) statements and their less recent (but unspecified) marketing efforts and warranties that during the relevant time period, defendants made intentional misstatements about the risks posed by PCBs.  It is unnecessary to decide whether that inference is plausible under Rule 8(a), as Hubbard-Hall appears to urge, because such an approach does not pass muster under Rule 9(b).[11]

### III.

Count two of the amended complaint alleges the boilerplate elements of a CUTPA claim.  Am. Cmpl. ¶¶ 134-37, 139.  Hubbard-Hall adds that it has suffered "financial injury, including the loss of business revenue associated with the shutdown of operations that will be necessary to mitigate the PCB contamination and the diminution in the value of Hubbard-Hall's property associated with the deed notation required by the proposed PCB mitigation plans."  Id. at ¶ 138.  Defendants contend that this alleged "financial injury" is product-related property damage for which the CPLA provides the exclusive remedy.

---

[11] If Hubbard-Hall could demonstrate Old Monsanto's knowledge of material risks attending PCBs at the relevant time and specifically identify contemporaneous statements touting the product's safety and efficacy, a jury might be able to reasonably infer reliance and proximate causation.  But in the absence of plausible allegations of knowledge and specific identification of intentional misstatements, Hubbard-Hall cannot rely on the fraudulent concealment exception.

Conn. Gen. Stat. § 52-572n(a) ("A product liability claim . . . shall be in lieu of all other claims against product sellers . . . for harm caused by a product.").  "The exclusivity provision makes the product liability act the exclusive means by which a party may secure a remedy for an injury caused by a defective product." Gerrity v. R.J. Reynolds Tobacco Co., 263 Conn. 120, 126, 818 A.2d 769, 773 (Conn. 2003).  On this basis, defendants ask the Court to dismiss the CUTPA claim.

The Connecticut Supreme Court has held that CUTPA claims are available for injuries "not caused by the defective product, or if the party is not pursuing a claim for personal injury, death or property damage." Gerrity, 263 Conn. at 128, 818 A.2d at 774 (internal quotation marks omitted).  In Gerrity, the CUTPA claim concerned the mark-up in the price of cigarettes facilitated by the defendants' misrepresentations about the safety of their products. Id. at 129-30, 818 A.2d at 775-76.  Hubbard-Hall analogizes its damages to the financial injury alleged in Gerrity.  But the harm alleged by Hubbard-Hall was "caused by the defective product," not by the defendant's misrepresentations, and the relief sought is available under the CPLA's provisions regarding "property damage."  Accordingly, defendants are entitled to judgment on the CUTPA claim. See W. Haven Sch. Dist. v. Owens-Corning Fiberglas Corp., CIV. H-85-1056(AHN), 1988 WL 250851, at *2-3 (D. Conn. July 21, 1988) (dismissing CUTPA claim

as "functionally identical to and coextensive with" products
claim, alleging that the asbestos-containing materials "by their
very presence damaged the plaintiff's property and caused the
plaintiff to expend large amounts of money" on abatement); cf.
Lebowitz v. Amica Mut. Ins. Co., NNHCV126027780, 2013 WL 4734742,
at *7 (Conn. Super. Ct. Aug. 8, 2013) (diminution in value, when
accompanied by physical property damage, is covered by insurance
policies insuring against losses "because of" property damage).

IV.

Under Connecticut law, an action to recover damages for
"property damage caused by exposure to a hazardous chemical
substance or mixture or hazardous pollutant released into the
environment" must be filed "within two years from the date when
the injury or damage complained of is discovered or in the
exercise of reasonable care should have been discovered."  Conn.
Gen. Stat. § 52-577c(b).  Defendants argue that Hubbard-Hall's
products liability claim founders on this statutory bar because
it had notice of PCB contamination on its property long before
June 17, 2008 (two years before it filed this lawsuit).

A. Legal Standard

Defendants raise their statute of limitations argument in
a motion for summary judgment.  On a summary judgment motion, the
Court's role is to determine whether the record presents triable
issues of fact.  Summary judgment should be granted "if the

23

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "material" fact is one that influences the case's outcome under substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to find for the non-movant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  The Court must view the record evidence in the light most favorable to the party opposing the motion, resolving all factual disputes and drawing all reasonable inferences in the non-movant's favor. Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).

     The limitations period in § 52-577c(b) begins to run when the plaintiff's injury "is discovered or in the exercise of reasonable care should have been discovered."  The "injury" that causes a claim to accrue must be a legal injury, or "actionable harm."  Bogdan v. Zimmer, Inc., 165 Fed. Appx. 883, 884 (2d Cir. 2006).  A plaintiff has experienced actionable harm when it "has knowledge of facts that would put a reasonable person on notice of the nature and extent of an injury, and that the injury was caused by the . . . conduct of another."  Id.  But harm need not have "reached its fullest manifestation" to trigger the statutory period.  Lagassey v. State, 268 Conn. 723, 749 (2004).  Harm supporting a legal action will suffice.  Nor need a plaintiff

*know* it has been injured before the action accrues.   It is notice of facts reasonably indicating legal injury, not certitude of harm, that starts the two-year clock.   <u>Bogdan</u>, 165 Fed. Appx. at 884; <u>Vector-Springfield Properties, Inc. v. Central Ill. Light Co., Inc.</u>, 108 F.3d 806, 810 n.3 (7th Cir. 1997).

B. <u>Discussion</u>

Analyzing the parties' arguments under § 52-577c(b) requires discussion of facts not set forth above.   Defendants' basic argument is that on eight distinct occasions between 1982 and 2007, Hubbard-Hall received notice that its property was contaminated with PCBs.   Some of the occasions are the subject of genuine disputes of material fact.[12]   For others, the presence or absence of such disputes is at least a very close question.   The genuine disputes need not be recounted, and the close questions need not be resolved.   Rather, defendants are entitled to summary

_____

[12]For instance, defendants argue that a report issued by the Connecticut Department of Environmental Protection ("DEP") in 1982 alerted Hubbard-Hall to the presence of PCBs on its land. ECF No. 85-1, at 6–7.   Hubbard-Hall's President, Andrew Skipp, testified in his deposition that he "probably" saw this report in 1982, ECF No. 85-7 at 82, and defendants urge the Court to "presume" knowledge of the report, given that it was issued by a public agency, ECF No. 132 at 10.   But Hubbard-Hall denies that Mr. Skipp in fact saw the report in 1982, ECF No. 108 at 2–3, and though the report was issued by a public agency the record does not demonstrate whether or how easily Hubbard-Hall could have acquired a copy.   Similarly, defendants argue that a report generated by an environmental consultant in 2006 shows PCB contamination on Hubbard-Hall's property, ECF No. 85-1 at 24–25, but Hubbard-Hall's evidence tends to show that defendants have misread the report, ECF No. 108, at 15–16.   These factual disputes are properly resolved by a jury, not the Court.

judgment based on the following facts, which are either

undisputed or, where noted, the object of a dispute resolved in

Hubbard-Hall's favor.[13]

In 1992, the EPA engaged a consulting firm called Roy F.

Weston, Inc. ("Weston") to inspect Hubbard-Hall's property.

Weston collected nine soil samples and analyzed them to determine

whether they contained certain contaminants, including PCBs.

Weston detected the presence of PCBs in two of the samples.  ECF

No. 109 at 19, 20.  It described its findings in a report

delivered to Hubbard-Hall in 1993:[14]

> PCBs (Aroclor 1254) were detected at high
> concentrations in soil samples SS-07 and SS-08.
> Aroclor 1254 was detected at 35.3 times the SQL in SS-
> 07 (1200 ug/kg) and 188.2 times the SQL in SS-08 (6400
> ug/kg).  Hubbard hall (*sic*) has never used or generated
> waste containing PCBs and it is unknown what this
> contaminant may be attributed to.

ECF No. 85-9, at 8.  Old Monsanto manufactured PCBs under the

trade name "Aroclor," and Aroclor 1254 is the particular

contaminant for which Hubbard-Hall seeks remediation costs.  Site

---

[13]Defendants also argue that Hubbard-Hall essentially pleads
notice in its complaint: it states that it bought PCB-containing
paint in the 1950s "because of the unique features of PCBs."  ECF
No. 38, at ¶ 136.  There is some merit to defendants' position,
but it is not clear beyond dispute that this demonstrates
Hubbard-Hall's awareness that PCBs were used on its property.
Hubbard-Hall might have known that its preferred paint had
valuable properties without knowing that those properties were
due to the presence of PCBs.  At this stage in the litigation,
the Court must assume that to be the case.

[14]The parties agree Hubbard-Hall's corporate officers viewed the
report when it was issued.

SS-07, at which Weston found PCBs in a concentration of 1200 ug/kg, is located about 100 feet from the edge of the area (adjacent to the Tank Farm Building) found to be contaminated in 2008.  Site SS-08, contaminated with PCBs to the tune of 6400 ug/kg, is about 310 feet from the edge of the affected area.[15] ECF No. 109, at 22 n.10.

Hubbard-Hall took no steps to remediate PCB contamination following its receipt of the Weston Report.  ECF No. 85-5, at 22. But in 1997, it hired an environmental consultant, HRP Associates, Inc. ("HRP"), to test its property for chemical contaminants.  HRP issued a report that summarized information generated by earlier investigations.  ECF No. 108, at 6-7.  The reported was delivered to Margaret Hart, Hubbard-Hall's environmental manager.  ECF No. 85-5, at 146-51.

Two aspects of the HRP report are of interest.  First, the copy of the report produced from Hubbard-Hall's files contains highlighting.  In the portion of the document discussing the earlier Weston Report,[16] the word "PCBs" is highlighted in yellow. So is the sentence, "The source for the PCBs does not appear attributable to Hubbard Hall manufacturing or waste generation practices."  ECF No. 85-10, at 5.  According to Hubbard-Hall, the

[15]Hubbard-Hall has provided some context for these numbers: it notes that the EPA's residential cleanup standard for PCBs in soil is 1000 ug/kg.  ECF No. 108, at 6.  Noting that the reading for SS-07 was just 1200 ug/kg, Hubbard-Hall disputes Weston's characterization of PCB concentration as "high."
[16]The relevant language is quoted above.

report was highlighted by Ms. Hart, who "reviewed the draft and highlighted certain portions of the text." ECF No. 85-20, at 3. Ms. Hart then gave the report to Hubbard-Hall's Chairman and then-President, Charles Kellogg, who "reviewed the draft report with Ms. Hart's highlights and added written notes." Id.

Second, the HRP report mentioned an earlier incident concerning the presence of PCB's on Hubbard-Hall's property. The report stated that in 1982, the DEP had received an anonymous tip accusing Hubbard-Hall of dumping some 8000 gallons of toxic solvents into a pit on its land. ECF No. 85-10, at 8. The DEP had investigated and taken two soil samples, which were tested for the presence of contaminants.[17] The HRP report reads: "Both samples also contained . . . PCBs with interferences."[18]

Hubbard-Hall appears to have taken no remedial steps in the immediate wake of the HRP report. In 2000, however, it hired a firm called ALTA to investigate its property. It is undisputed that ALTA's efforts involved testing for PCBs. According to Hubbard-Hall, this was not because it had any particular concern that PCBs would be found on its land. Rather, given the

_____

[17]As discussed above in n.12, Hubbard-Hall admits it knew about the anonymous tip but denies it learned the results of DEP's testing.

[18]The ellipses in the quoted language stand in for a portion of the text that is unreadable because it is covered by a Post-It note.  Handwriting on the note reads, "PITS – PCB."  ECF No. 85-10, at 9.  This note was apparently placed on the report by defendants' counsel during this litigation, not a Hubbard-Hall employee at an earlier date.  ECF No. 85-20, at 3.

circumstances – Hubbard-Hall was trying to demonstrate the absence of contaminants to the satisfaction of federal regulators – it was cost-effective to test for virtually all chemicals that might have been present. ECF No. 108, at 10. On defendants' motion for summary judgment, the Court credits Hubbard-Hall's version of events.

ALTA tested twenty-two locations on the lower portion of Hubbard-Hall's property (the location of the Tank Farm Building) and 39 locations on the upper portion. ECF No. 105, at 22. In 2003, it generated a report summarizing its findings. The section of the report entitled "Conclusions and Recommendations" reads as follows:

> The explorations, sampling and analyses performed by ALTA have generally been sufficient to evaluate the presence / absence of releases from identified [potential areas of concern] . . . . Results of these investigations are summarized below. Exceedances of the DEP default soil remediation standards were noted in the following areas, which warrant remediation or other action . . . :
>
> (1) Soil just southwest of the former South Loading Dock was found to be contaminated with PAHs, pesticides and PCBs . . . .
>
> (2) Shallow soil (8 to 12 in.) near the northwesterly corner of the building was found to be contaminated with PCBs. . . .
>
> Additional Phase III investigations into the degree and extent of soil and groundwater contamination . . . where remediation or other action is warranted under the RSRs, are recommended in all of the aforementioned areas.

ECF No. 85-30, at 9–11. Hubbard-Hall did not undertake all the

follow-up investigatory steps recommended by ALTA because it would have been "disruptive" and "expensive."  ECF No. 85-4, at 15.

Defendants argue that this evidence plainly demonstrates Hubbard-Hall's knowledge of PCB contamination and the need for further investigation and remediation.  Hubbard-Hall, however, has produced evidence suggesting that the report should not be taken at face value.  An ALTA employee has stated in an affidavit that ALTA's testing found no PCB contamination.  ECF No. 105, at 22.  She explains that the language quoted above – "soil . . . was found to be contaminated with PCBs" – was added to the report to address a "theoretical" gap in the data.  ECF No. 105, at 30.  ALTA had tested for total PCBs, but not "leachable" PCBs; it was possible, in theory, that further testing would reveal the presence of leachable PCBs.  Id.  The Court, like defendants, finds it somewhat odd that ALTA articulated the existence of a data gap by affirmatively stating that Hubbard-Hall's property was contaminated with PCBs.  But the Court nonetheless accepts Hubbard-Hall's account and assumes that the ALTA report was understood to say that ALTA's tests did not reveal the presence of PCBs.

Finally, in 2004, DEP inspected Hubbard-Hall's property and issued a report.  Hubbard-Hall appears to concede that it received a copy.  The report states: "The soils and groundwater

[on Hubbard-Hall's land] are significantly contaminated with solvents, metals, petroleum products, pesticides and polychlorinated biphenyls [PCBs]."  ECF No. 85-33, at 3.  John Paul, a Hubbard-Hall employee charged with overseeing environmental compliance, testified in his deposition that he "maybe . . . missed that particular sentence" in the report, or "didn't pay attention because [he] was more concerned about" contaminants other than PCBs.  ECF No. 85-17, at 21.

1. <u>Notice</u>

The sole question for the Court is whether these "references to and mentions of PCBs" put Hubbard-Hall on notice that its property was contaminated through the fault of another party.[19] ECF No. 109, at 3.  The Court concludes that they did and no reasonable jury could find otherwise.  Hubbard-Hall's claim accrued when it discovered its injury or should have discovered it in the exercise of reasonable care.  Conn. Gen. Stat. § 52-

---

[19]Hubbard-Hall also raises authentication and hearsay arguments, but these do not require much discussion.  Hubbard-Hall's authentication argument must be rejected in light of Attorney White's affidavit (ECF No. 133), which amply demonstrates that defendants are able to authenticate the documents on which they rely.  As for the hearsay question, defendants are not offering these documents to prove the truth of what they assert (that PCBs were present on Hubbard-Hall's property).  <u>See</u> Fed. R. Evid. 801(c).  There is no question that PCBs were present on the property; Hubbard-Hall alleges that it painted the Tank Farm Building with PCB-containing paint in 1954.  Defendants instead offer these documents to demonstrate that Hubbard-Hall was on notice of likely contamination.  The documents therefore fall outside the definition of hearsay.

577c(b).  This occurred in 1993.  And if it somehow did not occur in 1993, it occurred in 1997.

To briefly recount the facts discussed above, in 1993 Hubbard-Hall received a report from a consulting firm, Weston, engaged by the EPA to inspect its property.  The report noted "high concentrations" of Aroclor 1254, the contaminant in issue in this case, in the soil near the Tank Farm Building.  It also noted that Hubbard-Hall had never used or generated waste containing PCBs, meaning that the contamination was attributable to a third party.  Four years later, Hubbard-Hall received a copy of another report, this one issued by its own consultant, HRP. It recited the language from the Weston report.  Hubbard-Hall's environmental manager read that language, highlighted it, and showed the highlighted report to Hubbard-Hall's Chairman and President.  The same report stated that a 1982 DEP investigation detected PCBs on another portion of the company's property.

Hubbard-Hall therefore faces a difficult task: it must explain why three reports (one authored by DEP, one by a consultant hired by EPA, one by Hubbard-Hall's own consultant) stating that its property was contaminated with PCBs failed to put it on notice that its property was contaminated with PCBs. Hubbard-Hall endeavors to show that prior to 2008, the company could not be sure that its property was contaminated with PCBs.[20]

---

[20]There is one exception: Hubbard-Hall argues that the 2004 DEP report did not put it on notice of contamination because ALTA's

32

Of the Weston report, for instance, it notes that Weston characterized its results as "approximate."  The report also detected PCBs in "diluted" samples, which, according to Hubbard-Hall, rendered its results "unreliable and unconfirmed."  ECF No. 108, at 47.  Similarly, the 1997 HRP report relied in part on Weston's conclusions, so it exhibits all the Weston report's infirmities.  Moreover, it was just a "draft" report, not a final report.  ECF No. 109, at 23.  As for the 1982 DEP investigation described in the HRP report, Hubbard-Hall was not made aware of "what method the state laboratory may have used for its alleged PCB testing."  ECF No. 109, at 16.  What is more, "the DEP report does not include any backup data" to support its conclusions, and thus failed to demonstrate the presence of PCBs to Hubbard-Hall's satisfaction.  Id.

Hubbard-Hall misapprehends the relevant inquiry and its responsibilities under the law.  It was not incumbent on Weston, HRP or DEP to convince Hubbard-Hall based on unimpeachable evidence that its property was contaminated with PCBs.  It was rather incumbent on Hubbard-Hall to take reasonable steps to protect its interests once it learned it had probably been injured.  To take just one example, Hubbard-Hall was not entitled

—————————————
investigation (which occurred between 2000 and 2003) did not detect PCBs.  A reasonable person, it urges, would have discounted DEP's conclusions because they were contradicted by ALTA's data.  The Court will assume that a reasonable jury could so find.

to ignore the DEP's finding that PCBs were present on its land because the DEP's report did not describe its testing methods or furnish Hubbard-Hall with backup data. Were the law otherwise, potential plaintiffs could manipulate the limitations period through the simple expedient of closing their eyes to what they suspect or even believe to be true. This concern is particularly salient in the context of toxic clean-up cases. A party like Hubbard-Hall, on notice of likely contamination, might rationally keep mum in the hope that regulators would never order it to remediate. In the event remediation happened to be mandated, the party would lose nothing; it would simply sue then. And if contamination were to escape official notice indefinitely, so much the better – no need to sue, and no need to remediate.

The law sensibly expects more from companies on notice of contamination. When Hubbard-Hall received reports indicating that its land was contaminated with PCBs, it was obliged to take reasonable steps to determine whether PCBs were indeed present and, if they were, where they came from. It failed to do so. Under the case law, Hubbard-Hall's inaction was not justified simply because its information might have been incomplete. In Vector-Springfield, for instance, the plaintiff planned to sell a parcel of land. It knew the parcel adjoined the site of a defunct coal gas manufacturing plant. Vector-Springfield, 108 F.3d at 807. An environmental consultant engaged to evaluate the

parcel prior to sale wrote the plaintiff a letter stating,
"Investigations at similar former gas plant sites have revealed
contamination of soils and groundwater, in some cases well beyond
the site boundaries."  Id.  The consultant therefore recommended
further investigation of the site.  Some time later, its
suspicions were confirmed: the parcel was indeed contaminated.
The Seventh Circuit held that the plaintiff's cause of action
accrued when it saw the consultant's letter: "[A] reasonable
person, possessed of such a letter, would be put on notice of its
injury and . . . should determine whether legally actionable
conduct was involved."  Id. at 810;[21] see also Highland Indus.
Park, Inc. v. BEI Defense Sys., 357 F.3d 794, 797 (8th Cir. 2004)
(plaintiff on notice of injury when it received an environmental
consultant's report stating "that the contaminants in its
groundwater exceeded the maximum contaminant levels established
by the [EPA] as safe"); OBG Tech. Servs., Inc. v. Northrop
Grumman Space & Mission Sys. Corp., 503 F. Supp. 2d 490, 522 (D.
Conn. 2007) (claim dismissed because plaintiff, on notice of
contamination from an unknown source, failed to explain "what, if
anything, it did to try to determine the source of the"
contamination); SPS Ltd. P'ship, LLLP v. Severstal Sparrows

---

[21]Vector-Springfield was decided under Illinois's statute of
limitations, not Connecticut's.  But Illinois marks accrual in
the same fashion as Connecticut: the limitations period runs from
the time a plaintiff knows or should know she has been harmed.
Conn. Gen. Stat. § 52-577c(b); Vector-Springfield, 108 F.3d at
810 n.3.

Point, LLC, 808 F. Supp. 2d 794, 814-15 (D. Md. 2011) ("Because
the Phase I Environmental Assessment . . . states 'that
contamination from at least one of [the five study areas] . . .
*could be* impacting the . . . site,' it is clear that Plaintiffs
had 'knowledge of circumstances which would cause a reasonable
person . . . to undertake an investigation which, if pursued with
reasonable diligence, would have led to knowledge of the alleged
tort.") (emphasis added); LaBauve v. Olin Corp., 231 F.R.D. 632,
660 n.59 (M.D. Ala. 2005) ("Accordingly, plaintiffs' reliance on
Pressley's deposition testimony that she lacked 'solid
information' proving offsite contamination . . . is misplaced and
unavailing.").

In sum, the law does not permit a plaintiff to demand strict
proof of injury before its claim accrues.  On this record, a
reasonable jury would have to conclude that by 1997, at the
latest, Hubbard-Hall had received sufficient notice of
contamination to be charged with responsibility for investigating
its potential injury.  Hubbard-Hall would have discovered its
injury had it acted with reasonable care.  Thus, its claim
accrued no later than 1997 and is now time-barred.[22]

---

[22] Hubbard-Hall devotes a great deal of attention to ALTA's
investigation, which in the early 2000s found no evidence of PCB
contamination at 61 sites on the property.  In the Court's view,
the import of ALTA's investigation is limited to the issue
discussed above in footnote 20.  Notice of PCB contamination
received after ALTA's report, such as the 2004 DEP findings,
might reasonably have been discounted by Hubbard-Hall in reliance
on ALTA's work.  But that does not save the plaintiff from the

V.

Accordingly, the motion for judgment on the pleadings is hereby denied as to count one but granted as to count two.  The motion for summary judgment is hereby granted.

So ordered this 29th day of March 2015.


_____/s/_____
Robert N. Chatigny
United States District Judge


_____

effect of its earlier failure to investigate. Hubbard-Hall appears to concede that a reasonable investigation undertaken in the 1990s would have uncovered evidence of contamination.